No. 20-1014

THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


PAUL JONES,

Plaintiff-Appellant

v.

DOLAN CONNLY, P.C.; ORLANS PC; LINDA ORLANS; ALISON ORLANS, et. al.,

Defendants-Appellees


**ORLANS PC'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL APPENDIX**

The Appellees, Orlans PC, Linda Orlans and Alison Orlans hereby respectfully request that they be permitted to file a Supplemental Record Appendix. As grounds thereof, the Appellees state that the Appellant has filed his brief but no appendix has been filed. Since relevant documents from the underlying case are referred to in Orlans' Brief, Orlans seeks leave to formally file the Supplemental Record Appendix that is included herewith.

RESPECTFULLY SUBMITTED,
ORLANS PC
LINDA ORLANS
ALISON ORLANS,
By their Attorney,

*/s/ Effie Gikas*
Effie L. Gikas, Esq. BBO # 654693
Orlans PC
465 Waverley Oaks Road, Suite 401
Waltham, Massachusetts 02452
(781) 790-7835
egikas@orlans.com

No. 20-1014

THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

---

PAUL JONES,

Plaintiff-Appellant

v.

DOLAN CONNLY, P.C.; ORLANS PC; LINDA ORLANS; ALISON ORLANS, et.
al.,

Defendants-Appellees

## SUPPLEMENTAL RECORD APPENDIX OF ORLANS PC

1. Complaint. . . . . . . . . . . . . . . . . . . . . . . . .1

2. Note. . . . . . . . . . . . . . . . . . . . . . . . . . 36

3. Mortgage. . . . . . . . . . . . . . . . . . . . . . . . 45

4. Foreclosure Deed. . . . . . . . . . . . . . . . . . . . 66

5. Orlans PCs Post-Foreclosure Letter to Paul Jones. . . . . 71

6. Orlans' Motion to Dismiss. . . . . . . . . . . . . . . .76

7. Memorandum and Order on Motion to Dismiss. . . . . . . . .81

FILED
IN CLERK'S OFFICE

2019 MAY 29  PM 3: 02

U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

PAUL JONES

Plaintiff

                            Civil Action No.1:19-cv-11076-FDS

V.

DOLAN CONNLY P.C
JAMES W. DOLAN
BARBARA D. CONNLY
KATHLEEN M. ALLEN
DAVID A. MARSOCCI
CINDY SILVA
BANK OF NEW YORK MELLON
GREGORY A. CONNLY
ORLANS P.C
LINDA ORLANS
ALISON ORLANS
JANE DOE, and JOHN DOE,
SELECT PORTFOLIO SERVICING INC.

Defendants

## **VERIFIED AMENDED COMPLAINT**

### **Parties**

1.   The Plaintiff is a consumer and resident of Stoughton, County of Norfolk, Massachusetts and a citizen of

     the United States.

2.   Defendant Dolan Connly P.C (Dolan) is Law Firm that regularly collect defaulted debts due to another and

     has a usual place of business at 50 Redfield Street, Boston, Ma.

3.   Defendant James W. Dolan (James) is a partner at Dolan Connly P.C and an attorney that regularly collect defaulted

     debts owed to another and a resident of Massachusetts.

4.   Defendant Gregory A. Connly (Gregory) is a partner at Dolan Connly P.C and an attorney that regularly collect

     defaulted debts owed to another and a resident of Massachusetts.

1

5.  Defendant Barbara D. Connly (Barbara) is an attorney at Dolan Connly P.C that regularly collect defaulted debts owed to another and a resident of Massachusetts.

6.  Defendant Kathleen M. Allen (Kathleen)is an attorney at Dolan Connly P.C that regularly collect defaulted debts owed to another and a resident of Massachusetts concentrates her practice in the areas of real estate law, including landlord-tenant law, condominium development and debt collections for creditors.

7.  Defendant David A. Marsocci (David) is an attorney at the Law Office of Dolan Connly P.C that regularly collect defaulted debts owed to another and a resident of Massachusetts, he concentrates his practice in the areas of real estate law and debt collections for creditors.

8.  Defendant Cindy Silva (Cindy) is an employee of Dolan Connolly P.C a debt collector that regularly collects defaulted debts owed to another and is the property manager for Bank of New York as Trustee for CWABS, Inc and is a resident of Massachusetts.

9.  Defendant Bank of New York Mellon aka Bank of New York Mellon, as Trustee for CWABS, Inc, Asset Backed Certificates, Series 2004-7 (BNY)is a Delaware Corporation and has a usual place of business at 101 Barclays Street New York, NY 10286 that regularly collect defaulted debts.

10. Defendant Orlans P.C (Orlans) is organized as a professional corporation under Michigan law, with its principle place of business in Troy, Michigan. On March 6, 2017, the firm changed its name from "Orlans Associates, P.C.," to "Orlans PC." On March 10, 2017, Orlans PC filed an assumed name certificate for "Orlans Associates PC." that regularly collect defaulted debts.

11. Defendant Linda Orlans (Linda) is an attorney licensed to practice law in Michigan, and, on information and belief, a resident of Birmingham, Oakland County, Michigan and an attorney that regularly collect defaulted debts.

12. Defendant Alison Orlans (Alison) is President, Chief Executive Officer, and Secretary of Orlans PC. On information and belief, Alison Orlans is a resident of Birmingham, Oakland County, Michigan. On

information and belief, Alison Orlans is a law school graduate but not licensed to practice law in Michigan but she that regularly collect defaulted debts.

13.  Defendant "Jane Doe" and "John Doe" are placeholders for an indeterminate number of partners or shareholders of defendants that may bear individual culpability for the claims stated in this Complaint and who may be separately liable therefore.

14.  Defendant Select Portfolio Servicing, Inc. ('SPS") is a residential loan servicing company with headquarters located at 3217 S. Decker Lake Drive, Salt Lake City, Utah 84119. As of March 31, 2016, SPS serviced more than 400,000 loans nationwide. SPS enters into service agreements with lenders and note holders pursuant to which SPS provides servicing and agency activities for loan portfolios and to regularly collect defaulted debts.

## JURISDICTION

15.  This court has jurisdiction over this matter pursuant to 28 U.S.C. §1332.

16.  Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) in as much as the challenged actions are alleged to have been committed in this District, all Defendants regularly conduct business in this District, and the named Plaintiff reside in this District.

17.  Jurisdiction of this Court arises under 15 U.S.C. § 1692k(d), 28 U.S.C. § 1331, and supplemental jurisdiction exists of the state law claims pursuant to 28 U.S.C. § 1367. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

## INTRODUCTION

18.  This action seeks relief for unlawful, unfair and deceptive debt collection practices committed by defendants Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John, These Defendants are engaged in a high-volume debt collection practices that includes foreclosing on property's, evictions, sending mortgage statements and demanding money from plaintiff and seeking deficiency judgments.

3

19. Defendants Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John did not strictly comply with paragraph 22 of the mortgage or the statutory power of sale under Massachusetts law, which requires a foreclosing bank to "comply with the terms of the mortgage," G.L. c. 183, § 21.

20. Defendants Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe refused to even acknowledge their wrong doing as plaintiff pointed them out as early as 2015-2019, defendants actions became intentional, without regard , no just cause or excuse for the action which outside the penumbra of established concepts of fairness and was unethical and or unscrupulous resulting in personal injury to the plaintiff.

21. Plaintiff states that the proper remedy under these counts of his complaint is to void the April 9, 2019 foreclosure sale, issue an emergency TRO, find for the plaintiff against all the defendants on all counts in this complaint.

22. This approach is consistent with the SJC's recent decision in Pinti & Paiva v The Bank of New York Mellon 1:14-cv-14531-ADB here in this same court, regarding , which held that a foreclosing bank's "***strict compliance with the notice of default required by paragraph 22 was necessary in order for the foreclosure sale to be valid,***" and that the bank's "failure to strictly comply rendered the sale void."


## FACTS

23. All conditions precedent to the bringing of this action has been performed.

24. No defendants were served the original Verified Complaint as of May 28, 2019, and no responsive pleading was served May 28, 2019.

25. The amount in controversy exceeds $75,000 in this complaint.

26. Defendants Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe used did not strictly comply with paragraph 22 of the mortgage because the notice of default required by that paragraph was sent by the servicer of the loan (SPS), rather than by the lender BNY, this violated the statutory power of sale under Massachusetts law, which requires a foreclosing bank to "comply

4

with the terms of the mortgage," G.L. c. 183, § 21.Controlling case law requires strict compliance with paragraph 22 of the mortgage, and Plaintiff alleges that this standard was not satisfied servicer's sending of the notice of default.

27. Defendants Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe failed to record an affidavit of compliance required by GL c. 244, §§ 35B and 35C in the Norfolk Registry of deed as of May 28, 2019 after the April 9, 2018 foreclosure as of May 28, 2019.

28. Plaintiff states for the record § 15A is a "statute relating to the foreclosure of mortgages" pursuant to the statutory power of sale, G.L. c. 183, § 21, and that, as with paragraph 22 of the mortgage, strict compliance with § 15A is required, the proper remedy under either these two counts of the complaint are to void the foreclosure.

29. The date of SPS notice of default to Plaintiff states BNY was the lender and SPS was the servicer of the loan.

30. Defendants SPS on behalf of BNY notice of default did not satisfy the requirements of paragraph 22 of the mortgage, not because any of the required substance was missing from the notice, but because the notice should have come from BNY as the lender, rather than from SPS as the servicer of the loan.

31. SPS approach is contray with the SJC's decision in *Pinti v Emigrant*, which held that a foreclosing bank's "strict compliance with the notice of default required by paragraph 22 was necessary in order for the foreclosure sale to be valid," and that the bank's "failure to strictly comply rendered the sale void." 33 N.E.3d at 1226, the SJC's decided to give it only prospective effect after July 17, 2015.

32. Defendants SPS & BNY did not strictly comply with § 15A, which requires a foreclosing bank to notify the tax collector (among other third parties) of a foreclosure sale within 30 days of conveying title. G.L. c. 244, § 15A. this lapse invalidates the foreclosure, under several SJC decisions, strict compliance with § 15A is required, and the consequence of non-compliance is the invalidation of the foreclosure sale.

33. The defendant's Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe refusal to make a reasonable settlement offer forced the plaintiff to incur substantial additional fees and to suffer harm including loss of **consortium, personal injuries** to the deprivation of

5

the benefits of a family relationship due to injuries caused by all above defendants, Plaintiff suffered an injury's as a result of the all the above Defendant's actions while trying to collect an alleged but nonexistent defaulted debt these action met the threshold of Article III Standing plaintiff suffered a concrete and particularized injury.

34. Defendants Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe used "false, deceptive, misleading, unfair, and unconscionable practices in connection with their attempt to collect an alleged but nonexistent defaulted debt from Plaintiff.

35. This case falls within a category of debt collection cases, all defendants conspired to violate Federal & State consumer statue laws and did so by not following Massachusetts Consumer and foreclosure laws when foreclosing.

36. Plaintiff attempted to rectify the situation with the defendants Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe starting as early as July 28, 2015.

37. Defendant's Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe actions caused personal injury to the plaintiff, *all* the Defendants either intended to cause the Plaintiff personal injury or that all the defendants were substantially certain their acts would cause plaintiff personal injury.

38. Defendants Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe knew or should have known that their wrongful acts were done with intent to injure plaintiff and did so, and their wrongful acts would almost certainly produce harm (personal injury) to the plaintiff, and their wrongful acts had a high probability of causing plaintiff harm.

39. Defendant's Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe actions were wrong willful, deliberate and done without regard to its consequences and "without just (*unjustified*) cause or excuse" and therefore were malicious within the meaning of § 523(a)(6) / MGL 93a.

40. Defendant's Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe refusal to grant plaintiff relief upon demand, defendants knew or should have known with

6

knowledge or reason to know that the act or practice complained of was contrary to Massachusetts Unfair & Deceptive Trade Practices Act (MGL93a), Massachusetts Debt Collection Regulation Act 940 CMR *7.00* et seq (MDCRA) , Federal Debt Collection Practices Act (FDCPA) and other Federal & State statues.

41.  Defendants SPS, Dolan, Orlans, Orlans, BNY James, Gregory, Barbara, Kathleen, David are attorneys or Law Firms or corporations that employee 5-100 attorneys that are responsible for overseeing all correspondence sent to the plaintiff, these attorneys should have informed the agent that their actions were contrary to Federal & State laws.

42. All Defendants had no just cause or excuse for the action which outside the penumbra of established concepts of fairness and was unethical and or unscrupulous resulting in personal injury to the plaintiff.

43.  Defendants Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe have acted in knowing disregard of the rights of the plaintiff, all the defendants should have foreseen that injury could occur to the plaintiff.

*44.*  Defendants BNY acted as absentee owners who recklessly failed to supervise their out of control agents including Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, Orlans, Linda, Alison, Jane Doe, John Doe.

*45.*  Defendants Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe threated to foreclose on consumer's residence and did so after Countrywide Mortgage post acceleration (2005) and BNY post foreclosure (2008).

46.  Defendants BNY, SPS, Orlans, Linda Orlans, Alison Orlans Foreclosed or caused to be foreclosed on or about April 9, 2018, without having legal entitlement to do so, as the defendant BNY had already accelerated the mortgage in 2005 thus cause all amounts to become due in 2005.

47.   BNY also foreclosed on the property on or about Dec 2008 (over 11 years) causing there to be no present right to possession of the property of an enforceable security interest as of 2008 under plaintiff name in the Norfolk Registry of deeds.

48.  On April 9, 2019 when defendants foreclosed on the said property it was exempt by law from foreclosure under plaintiffs name, BNK repurchased the home at the 2008 foreclosure sale, after BNY foreclosed

therefore defendants had no legal entitlement to send plaintiff any monthly statements with fees, or file

any foreclose documents in the court or the Norfolk County Registry of deeds regarding the April 2018

foreclosure.

## ARTICLE III STANDING

49.   In Spokeo, the Supreme Court reaffirmed the well-established principle that a plaintiff invoking the

jurisdiction of an Article III court must establish "injury in fact." Spokeo, Slip op. at 6. In particular, "a

plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and

particularized' and 'actual or imminent, not conjectural or hypothetical.'"

50.   Plaintiff has suffered and will continue to suffer harm and an invasion of a legally protected act and has

suffered invasion of a legally protected interest and suffered an injury in fact that is concrete and

particularized.

51.   By defendants second foreclosure and recording made in the Registry of Deeds, this recording is for life,

only approximately four years or more of on-time payments will restore the Plaintiff credit score. Plaintiff

has suffered from on or about Dec 2008 until Dec 2015 and has rebuilt his credit reports (Scores) which

was very hard work as Plaintiff and his family depends on his credit score to make ends meet. Plaintiffs

2007 foreclosure played hand in hand with escalating rates that pushed the plaintiff and his family deeper

and deeper into debt from Dec 2008 until Dec 2015.

52. Plaintiff will and has suffered many years of expensive and limited credit and long-term consequences of

the first foreclosure (Approximately Dec 2008) and the second April 9, 2018 foreclosure, that will make

financial recovery very difficult for the plaintiff for the second time. The components of a FICO score

consist of payment history, amounts owed, length of credit history, new credit, and types of credit used. To

qualify for a conventional loan, most borrowers will want to see a credit score above 620.

53. The Defendants April 9, 2019 foreclosure, it has the potential to cause Plaintiffs credit scores to drop by

250-280 points, this is contrary to Federal & State Laws, this is an invasion of privacy and is a concrete and

particularized injury.

54. While it's common to hear about money issues and foreclosure the plaintiff now again can suffer a tax consequence of such a process. A foreclosure or a filing in the Registry of deeds brings about a property title transfer and subsequent tax assessment. All the defendants do not realize that by conducting a second foreclosure while plaintiff did not even have both legal and equitable title to the property, plaintiff is likely going to face tax implications from the IRS, defendants cannot sell a property and transfer property to themselves a second time and hold plaintiff accountable to bogus fees and $634,000.01 (See Exhibit 7). Non-existing debt and a Deficiency judgment $383,435,82, Plaintiff faces a debt forgiveness or a deficiency judgement of $383,435,82, this is an injury in fact and it is concrete and particularized.

55. Basically, any time debt is forgiven; it is considered a taxable event. The IRS states that any borrowed money that is not paid back is considered as income and is taxable (https://www.irs.gov/newsroom/home-foreclosure-and-debt-cancellation) A mortgage involves the bank or lender granting funds to the owner in return for a promise to pay the funds back. When the owner begins repaying the money, this money is not claimed as income on their tax return. If, however, this debt amount is canceled or forgiven, it will have to be included as income for tax purposes. The loan amount is considered as income because there is no longer an obligation to repay the lender for the same.

56. Once the property is finally sold, the tax consequences come in. The original loan was based on the value of the property, but these values keep changing. If the property is sold for less than it was originally worth, and the bank is unable to recover all the money it had lent, the balance is reported to the property owner and the IRS on a Form 1099-C, Cancellation of Debt. This amount is considered as income and must be reported on the homeowner's income tax form leading to capital gains and income tax applicable, this is a concrete and particularized injury.

57. As a direct consequence of Defendants' acts, practices and conduct, Plaintiff suffered and continues to suffer from loss of consortium, humiliation, anger, anxiety, emotional distress, fear, frustration, embarrassment, loss of sleep, anxiety, depression, loss of appetite and economic injury. plaintiff was enrolled in college but had to drop out due to the stress of receiving a $634,000.01 (See Exhibit 7) alleged but nonexistent debt this was and is a concrete and particularized injury under Article II standing.

SUPREME COURT UNANIMOUS DECISION IN

OBDUSKEY V. McCARTHY & HOLTHUS L.L.P

58. On March 20, 2019, the Supreme Court's unanimous decision in Obduskey v. McCarthy & Holthus L.L.P.
examined liability for violations of the Fair Debt Collection Practices Act (FDCPA) that are committed in
non-judicial foreclosures. Although the Court did not discuss exactly what type of conduct by an entity
whose principal purpose is enforcement of security interests would violate § 1692f(6), it stated as an
example that it is "at least plausible that 'threatening' to foreclose on a consumer's home without having
legal entitlement to do so is the kind of 'nonjudicial action' without 'present right to possession' prohibited
by that section." This is exactly what all defendants did.

59.   This is the kind of 'nonjudicial action' without 'present right to possession' prohibited by the FDCPA that
the Supreme Judicial Court pointed to in their order.". Section 1692f(6) states the following conduct
violates the FDCPA:

(6) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property
if—

(A) there is no present right to possession of the property claimed as collateral through an enforceable
security interest;

(B) there is no present intention to take possession of the property; or

(C) the property is exempt by law from such dispossession or disablement.

60.   Obduskey holds that entities whose principal purpose is enforcing security interests are subject only to §
1692f(6) (not other FDCPA provisions) when they conduct non-judicial foreclosures in a manner required
by state law. Defendants BNY, SPS, Orlans, Linda Orlans, Alison Orlans are liable for claims arising from
foreclosures under the entire FDCPA post-Obduskey, because as the Supreme court has stated: 1. Entities
enforcing a security interest when the entity's principal purpose is not the enforcement of security
interests; 2. Entities enforcing a security interest in a manner not by state law (Massachusetts); and
Entities engaged in judicial foreclosure.

61. Defendants BNY, SPS, Orlans, Linda Orlans, Alison Orlans principal purpose is not the enforcement of security interest it is collecting defaulted debts, there was no legal security interest on the property because the mortgage & note (security interest) was already accelerated in 2005 and foreclosed in 2008, no security interest of plaintiff was enforceable after foreclosure in 2008, defendants so called foreclose in April 9, 2018 should be held by this as null & void on its face.

## PREVIOUS ACCELERATION OF MORTGAGE & FORECLOSURE

62. On June 22, 2004, Plaintiff executed a negotiable promissory note and a security interest in the form of a mortgage approximately $274,550.00 the mortgage document was filed as document number Book 22224, Page 219 in the Norfolk Registry of Deeds (*See Exhibit 1*).

63. On August 5, 2005 Plaintiff received a notice of acceleration from Countrywide Mortgage (Servicer) thus accelerating the mortgage and the total amount became due (*See Exhibit 2*).

64. On December 6, 2006 BNY was issued an Order of Notice to foreclose from Massachusetts Land Court's, a true and correct copy of the Massachusetts Land Court's Order is attached hereto as *Exhibit 3*.

65. Bank of New York, Trustee, by way of Ablitt law firm, served upon the plaintiff its January 12,2007 Notice of Intention to Foreclose Mortgage and of Deficiency After Foreclosure of Mortgage, the January 12, 2007 Notice of Mortgage Foreclosure Sale, and the advertised January 12, 2007 Notice of Mortgagee's Sale of Real Estate (collectively, *Exhibit 4*).

66. On or about January 22, 2007 BNY by way of Ablitt Law firm Plaintiff home 572 Park Street Stoughton, Ma 02072 was foreclosed at an auction by BNY and was repurchased by BNY for approximately $320,000.

67. On approximately February 27, 2008 BNY by way of Ablitt Law firm, served upon the plaintiff a Certificate of Entry, a true and correct copy of the February 25, 2008 Certificate of Entry is attached hereto as **Exhibit 5**.

68. On approximately February 27, 2008 BNY by way of Ablitt Law firm, served upon the plaintiff a Foreclosure Deed, a true and correct copy is attached hereto as **Exhibit 6**.

69. Plaintiff put defendants Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe of notice that their actions were contrary to the FDCPA, MGL 93a and other Federal & State statues by sending multiples notices , demand letter and exhibits to clearly point out that there was no debt due from plaintiff, because an acceleration and foreclosure had already taken place in 2005 & approximately Dec of 2008.

70. Defendants Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe ignored all plaintiff's correspondence, plaintiff even informed all defendants that their action was wrong, deliberate, done without regard to its consequences, malicious, without just (unjustified) cause or excuse and therefore has caused Plaintiff Paul Jones personal injury.

71. BNY actions should be imputed to all the defendants under vicarious liability based upon their vicarious liability flowing from the actions of BNY.

**FACTS REGARDING DEFENDANT**

**SELECT PORTFOLIO SERVICING INC (SPS)**

72. Plaintiff Paul Jones claims in this lawsuit that all defendants' actions were contrary to the FDCPA, MGL 93 a and other State & Federal Laws while attempting to collect an alleged but nonexistent debt from plaintiff. The defendant Select Portfolio Servicing asserted that the company is a "special servicer" of residential mortgage loans, which collects on defaulted or delinquent mortgages.

73. To collect a debt in a non-judicial state like Massachusetts, the defendant Select Portfolio Servicing must follow federal and Massachusetts State laws.

74. Despite the 2005 Acceleration and Foreclosure on or about February 2008 on Plaintiffs property located at 572 Park Street, Stoughton, Ma 02072, the plaintiff received a notice that the Bank of America mortgage was transferred to Select Portfolio Servicing for collection on or about July 16, 2015. Weeks later, plaintiff received a "notice of debt" from Select Portfolio Servicing on or about July 24, 2015, stating that late charges would accrue and "vary from day to day."

75. On approximately July 13, 2015 plaintiff received a notice from Defendant SPS that stated, "We are pleased to inform you that the servicing of your 1st mortgage loan will be transferred from Bank of America N.A to Select Portfolio Servicing, Inc. (SPS) effective July 16, 2015" This notice had a payment coupon attached to it See Exhibit 7.

76. Defendant SPS sent plaintiff approximately 33 Unfair & Deceptive mortgage statements the first being on July 29, 2015 approximately  April 12, 2018which defendant SPS demanded from plaintiff $339,499.00, this monthly statement stated plaintiff owed "Principal $477.28, Interest of 1452.30, Escrow (Taxes & Insurance) of $864.11, Regular Monthly payment of $2,793.00, Unpaid late charges $876.81, Other charges and fees of $15.084.00 and Charges / Fees this period $876.81,Past Due payments of $320,745.35 Total amount Due $339,499.98 as of here after Fees"  approximately April 18, 2018 defendant mortgage statement stated plaintiff owed approximately $634,000.01 (See Exhibit 7).

77. Defendant SPS mortgage statements were confusing, unfair, deceptive, false, baffling, willful and caused significant harm and personal injurie to plaintiff.

78. These mortgage statements were contrary to the Federal Debt Collection Practices Act (FDCPA), The Massachusetts Unfair & deceptive Trade Practices Act (MGL 93a), The Massachusetts Debt Collection Regulations Act (MDCRA) and other Federal & State law.

79. Plaintiff informed defendants Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe, SPS that plaintiff did not have a mortgage with BNY in his name since Dec 2008.

80. Defendant's actions were Willful, **Intentional,** Malicious wrong, without just, cause or excuse" and therefore "malicious" within the meaning of § 523(a)(6), all the defendants intended to cause and did cause personal injury and there was a substantial certainty the injury would result from all the defendants act.

81. Defendant SPS has no offices in the state of Massachusetts therefore plaintiff needed not to send an MGL 93 demand letter, but plaintiff did so.

13

82. Plaintiffs loan had been accelerated in 2005 and foreclosed upon on or about December 2008 prior to SPS becoming the servicer, no Mortgage Statements should have been sent to plaintiff to demand money that included Principal, Interest, Escrow (Taxes & Insurance), Regular Monthly payment, Unpaid late charges, Other charges and fees and Charges / Fees late fees, mortgage statements could lawfully be imposed or collected by SPS, operating as BNY agent, unless specifically authorized by the mortgage agreement. Plaintiffs standard form mortgage agreements do not permit the charging and collection of any of the above fees post-acceleration-foreclosure, this is and was contrary to Federal & state Laws.

83. Despite acceleration of the Plaintiffs loan in 2005 and a 2008 foreclosure, Defendant Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, Orlans, Linda, Alison, Jane Doe, John Doe, SPS operating as BNY agent, falsely represented that the above fees could and would be charged to Plaintiffs loan and SPS would foreclose if Plaintiff failed to make payments in full by a date certain.

84. On approximately December 17, 2017, Defendant SPS mailed a standard form mortgage statement to Plaintiff which stated that, "This account has been accelerated, which means that all outstanding amounts are due." The SPS December 17, 2017 mortgage statement further stated, "If payment is received after January 15, 2018, fees will be assets late fee will be charged." That mortgage statement indicated that there were "unpaid late charges and other charges and fees, defendant SPS has these documents in their possession.

85. There is thus no provision in Plaintiff mortgage agreement which permits any of the defendants to charge or collect a late fees post-acceleration and post foreclosure, whether for itself or on behalf of BNY or any other lender or note-holder. Nevertheless, all defendants, operating as BNY agent, continued to assess plaintiff bogus fees, these acts by all defendant on behalf of BNY is contrary to Federal & State laws.

86. On several occasions' defendant Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe, SPS ordered an Inspection of the property located at 572 Park

Street and charged it to the plaintiff, plaintiffs video surveillance of the property capture individuals remove car covers from his car and taking the license plates down on paper.

87. On several occasions' plaintiff came home from work to find that someone had entered the residence and left the front and side door unlocked, thus leaving plaintiffs property at risk of being stolen, this caused plaintiff anxiety, emotional distress and fear.

88. Upon information and belief, SPS utilizes a software-based servicing system

which automatically orders property inspections, and charges the borrower's account for the inspections, if a borrower is in default. The only criteria for the inspection to be ordered and charged is that the loan has been in default for a certain number of days. The inspection is ordered and charged regardless of whether there is a lawful and reasonable basis for ordering the inspection or whether the borrower may be legally charged for the inspection.

89. SPS and its automated servicing system, intentionally ignores whether Plaintiff, are living in their homes at the time of the inspections, even if an individual has provided proof of occupancy, or otherwise have been in contact with SPS by telephone or written correspondence.

90. Defendants Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe, SPS never acted on behalf of a principal that had the right to enforce the obligation of the note & mortgage, therefore the April 9, 2018 foreclosure is should be considered NULL & VOID.

91. When a servicer (SPS) seeks to foreclose as the agent for the owner or holder of the loan, the servicer must meet two basic tests. First, the servicer must act on behalf of a principal that has the right to enforce the obligation. Second, the principal must have delegated authority to the servicer to perform the particular activity in question, BNY or SPS did not have the authority to conduct a second foreclosure there was no legal entitlement or active security interest note and or mortgage.

92. All Defendants acted as agent for BNY and SPS, therefore when any defendants took any court actions against plaintiff it triggered actions that were contrary to the FDCPA, MGL 93a, MDCRA & other violations of Federal & State Laws.

15

93. Plaintiff is within statute of limitations of the MGL 93A claims, MDCRA, FDCPA and other Federal & State violations and the alleged personal injury which gave rise to the lawsuit.

94. On approximately April of 2017 defendant BNY hired defendants Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe, SPS to foreclosed on 572 Park Street Stoughton, Ma 02072 for a 2nd time and sent plaintiff a bill for over $634,000.01 (See Exhibit 7) this bill is post 2008 foreclosure and post acceleration of 2005 these actions and conduct by the defendants were and is contrary to the above mentioned Federal & State Laws in this complaint.

## FACTS REGARDING DEFENDANT ORLANS PC

95. In 1998, Linda Orlans founded in Troy, Michigan, the firm that was to be known for many years as Orlans Associates PC, one of the largest foreclosure firms in Michigan.

96. In approximately 2007, Linda Orlans formed Orlans Moran PLLC as a Michigan professional limited liability corporation, with operations based in greater Boston, to provide substantially similar mortgage default (foreclosure) services in Massachusetts and surrounding states. In early 2017, Linda Orlans and her daughter, Alison formed Orlans PC in a transaction whereby Orlans Moran PLLC was merged into Orlans Associates PC, whose name was changed to Orlans PC.

97. Orlans PC operates from offices in Troy, Michigan, Waltham, Massachusetts, Rockville, Maryland, Leesburg, Virginia, and Williamsburg and Georgetown, Delaware. It provides foreclosure services for properties located in some 14 jurisdictions, including, Michigan, Massachusetts, Maryland, and Virginia.

98. Under both the FDCPA, MGL 93a, MDCRA statutes courts apply an objective "least sophisticated consumer" standard to determine whether communications are misleading.

99. This case falls within a category of wrongful foreclosure, personal injury debt collection case. A form letters and notices from Orlans PC that are the subject of this Complaint are misleading in violation of both Federal and State laws because they suggest to consumers that they were from an attorney, when in fact they were

16

not. Instead, these letters were generated and sent by non-attorney personnel with minimal or no substantive attorney review or involvement.

100.   All Defendants knew or should have know that a previous acceleration in 2005 and a previous foreclosure had accrued on 572 Park Street Stoughton, Ma (Plaintiff informed them in writing), and by Orlans P.C sending plaintiff Notices would be contrary to Federal & State laws and would trigger violations Federal & Statues.

101.   On information and belief, Orlans PC is, and has for many years has been, the second largest foreclosure firm in Michigan based on number of foreclosures processed. At all relevant times Orlans PC, in the ordinary course of its business, regularly engaged in the practice of collecting defaulted debts on behalf of other individuals or entities.

102.   Defendants Orlans, Linda Orlans, Alison clients are, and Orlans Moran's clients were, mostly banks, other investors and lenders, and mortgage servicers who require "default services," i.e., the foreclosure of mortgages on real property in the event of an alleged default.

103.   Defendants Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe, SPS is engaged in the business of foreclosing on homes, and a large portion of its business derives from its foreclosure practice.

104.   At all relevant times Orlans PC, in the ordinary course of its business, regularly engaged in the practice of collecting debts on behalf of other individuals or entities.

105.   According to its website, www.orlanspc.com, the firm "is the preferred legal services provider of over 200 real estate and financial services companies." On information and belief, Orlans PC operates in some 14 states conducting Judicial and non-Judicial foreclosures and are debt collectors that regularly collect debts due to another.

106.   Orlans PC's clients are, and Orlans Moran's clients were, mostly banks, other investors and lenders, and mortgage servicers who require "default services," i.e., the foreclosure of mortgages on real property in the event of an alleged default.

107.   Orlans PC is engaged in the business of foreclosing on homes, and a large portion of its business derives from its foreclosure debt collection practice.

108.   At all relevant times Orlans PC, in the ordinary course of its business, regularly engaged in the practice of collecting debts on behalf of other individuals or entities.

109.   According to its website, www.orlanspc.com, the firm "is the preferred legal services provider of over 200 real estate and financial services companies." On information and belief, Orlans PC operates in some 14 states.

110.   Orlans PC prides itself on its "lean" operations. According to its website, it "is an overwhelmingly different approach to legal services: refined processes and a powerful investment in IT produces precision, quality, and results." In a recent interview, Linda Orlans touted her firm for "creating a more capable, more responsive and more efficient entity to serve a growing client base." According to the firm's website, "[s]implicity isn't just a word for us. It is a mantra that is intertwined deep within our culture as we strive to simplify both our clients' lives and each other's."

111.   The firm says that its "pioneering legal simplicity and striving to make the law more accessible and affordable" for national banks, credit unions, consumer loan finance companies, loan servicers, investors, and other clients.

112.   In its job descriptions for posted attorney openings the firm describes its practice as "high volume" and "fast paced.".

113.   As of May 16, 2018, Orlans PC employed 12 attorneys licensed to practice law in Michigan, including Linda Orlans, unlike most law firms, Orlans PC's website does not list its attorneys.

114.   According to its listing on monster.com, a popular online job search and application service, Orlans PC has between 500 and 999 employees across its operations, assuming Orlans PC has 30 licensed attorneys (including the 12 licensed in Michigan, its headquarters), and only 500 employees (the very bottom of the range in its monster.com listing), the attorney-to-staff ratio would be less than one in 16. If Orlans PC has 500 employees, of which 30 are attorneys, then some 6% of its employees are attorneys.

115.    On information and belief, other law firms in Michigan and Massachusetts have substantially fewer staff in relation to attorneys than Orlans PC.

116.    In 2012, The Managing Partner Forum, working with ALM Legal Intelligence and The National Law Journal, conducted a comprehensive survey of mid-size US law firms. (ALM Survey.) Some 196 firms, with nearly 10,000 lawyers, participated.

117.    The ALM Survey found that in 2012 law firms averaged 83 support staff per 100 lawyers (ratio of 0.83 staff to one lawyer). If Orlans PC has a total of 30 lawyers and had an average ratio of support staff to lawyers, it would have approximately 25 support staff for a total of 55 employees (rather than 500 or more). Alternatively, if Orlans PC has 500 employees and had an average ratio of support staff to attorneys among mid-sized American law firms, it would employ approximately 273 attorneys rather than less than 50.

118.    The vast majority of non-commercial residential property foreclosures conducted by Orlans PC in Michigan and in other states have been pursuant to Judicial & non-judicial foreclosure statutes.

119.    In Massachusetts, the vast majority of Orlans PC's foreclosures have been pursuant to Massachusetts foreclosure by advertisement statute.

120.    In plaintiff's foreclosure by advertisement proceeding in Massachusetts handled by defendant Orlans PC, Orlans PC has sent letters to the Plaintiff in substantial conformity with Exhibits 8,9 and to this Complaint, in that each such letter:

    a. Was on Orlans P.C firm letterhead;

    b. Displayed Orlans P.C;

    c. Identified Orlans PC's client as the creditor or servicing agent;

    d. Indicated that Orlans PC was a law firm retained to foreclose the debtor's mortgage;

    e. Did not disclaim that it was from an attorney;

    f. Was (with rare exception) unsigned by an individual Orlans PC lawyer; and

    g. Contained the typographic text "By its attorneys Orlans Associates, P.C." or "Very truly yours Orlans P.C "or "Orlans PC" at the end of the letter in the signature block.

121.    These letters were and are contrary to the FDCPA, MGL93a MDCRA and other Federal & State Laws.

122.    Defendants Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe, SPS knew or should have know that these letters to plaintiff, plaintiffs' spouse and plaintiffs' job were contrary to the FDCPA, MGL 93a, MDCRA and other Federal & State Laws, see Exhibit 9.

123.    Orlans PC operates from offices in Troy, Michigan, Waltham, Massachusetts, Rockville, Maryland, Leesburg, Virginia, and Williamsburg and Georgetown, Delaware *Judicial & non-Judicial states*. It provides Judicial & Non-Judicial foreclosure services for properties located in some 14 jurisdictions.

### The Orlans PC Foreclosure Letter

124.    From on or about March 2015 until February 1, 2019 Defendants Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe, SPS sent or caused to be sent to plaintiff, plaintiffs spouse and plaintiffs job (573 Park Street, Stoughton, Ma, 24 Deckard Street Dorchester, Ma and 79 Thompson St, Springfield, Ma ) by U.S. Mail a letters informing him that defendants had been retained by BNY to foreclose on his residence that he occupied at 572 Park Street Stoughton, Ma 02072. A true and correct copy of the letters is attached as *Exhibit 10* hereto,

125.    On or about March 1, 2018 Defendants Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe, SPS sent or caused to be sent to plaintiff and people other than the plaintiff a "Notice of Intention to Foreclose and of Deficiency After Foreclosure.

*126.*    The letter was sent after post acceleration 2005 and foreclosure in December 2008. Orlans P.C knew or should have known that these letters to plaintiff, plaintiffs' job and plaintiffs' spouse were contrary to the FDCPA, MGL 93a, MDCRA and other Federal & State consumer Laws, *See Exhibit 9.*

127.   On or about April 10, 2018 Plaintiff sent Defendant Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe, SPS a MGL 93a Demand Letter, Preservation Notice, FDCPA Validation request and a Notice of Intent, *See Exhibit 10*.

128.   On or about April 20, 2018 Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe, SPS sent or caused to be sent plaintiff and people other than the plaintiff a "Notice acknowledgement of receipt of correspondence from Plaintiff (MGL 93a, Preservation letter, FDCPA request & Notice of Intent) *See Exhibit 10*.

129.   On or about August 31, 2018 Dolan, James, Gregory, Cindy , Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe, SPS sent or caused to be sent plaintiff and people other than the plaintiff an unsigned "notice of Service Members Civil Relief Act (50 USC App. 501-596)(SCRA) *(See Exhibit 11)* to plaintiffs home, Job and mothers home,  Orlans P.C knew from corresponding with plaintiff that plaintiff receives all his correspondence at his residence the subject property.

130.   On September 19, 2018 Defendant Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe, SPS mailed or caused to be mailed a notice that stated plaintiffs' total debt was *$630,935.82*, these notices went to three address 1. Plaintiffs residence 572 Park Street, Stoughton, Ma 02072 2. Plaintiffs mothers' home (Addressed to Plaintiffs spouse) 24 Deckard Street Dorchester, Ma 02121 3. Plaintiff Job 79 Thompson Street, Springfield, Ma 01109 (See Exhibit 11) Defendants Orlans letters were not signed from any attorney office.

131.   On April 9, 2018 defendants Dolan, James, Gregory, Cindy , Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe or SPS held a foreclosure sale upon 572 Park Street Stoughton, Ma 02072, post 2005 acceleration & Post foreclosure 2008 there was no mortgage & note to enforce in plaintiffs name this was contrary to **MGL c. 244 § 14, c. 183 § 21**, MGL 93a, MDCRA, FDCPA and other Federal & State Statutes.

132.   The mortgage debt referenced all of defendants Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe, SPS correspondence to Plaintiff arose out of transactions

in which the money, property, insurance, or services that are the subject of the transaction were primarily for personal, family, or household purposes.

133.  Plaintiff was confused by defendants Dolan, James, Gregory, Cindy, Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe, SPS Foreclosure Correspondence in that it appeared to be from an attorney, but was not signed by one, and did not identify the full name of an attorney.

134.  Plaintiff was not certain whether or not defendants Orlans foreclosure Letters and correspondence was from an attorney, the suggestion in the correspondence that it was from an attorney raised plaintiff's anxiety.

135.  The appearance that the defendants Dolan, James, Gregory, Cindy ,Barbara, Kathleen, David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe, SPS correspondence & foreclosure Letters may have been from an attorney suggested to plaintiff that an attorney may have conducted an independent investigation and substantive legal review of the circumstances of his alleged defaulted account, such that his prospects for avoiding foreclosure and a *$630,935.82* debt were diminished.

136.  The second Foreclosure was so Fundamentally unfair that Plaintiff is entitled to affirmative equitable relief, a Temporary Restraining Order (TRO) specifically the setting aside of the foreclosure sale as defendants' failure to comply strictly with the power of sale provided in the mortgage as there was no mortgage to foreclose on, the second foreclosure that happen on or about April 9, 2018.

137.  Plaintiff has and will suffer economic lost due to a second record being published at the Norfolk registry of deeds, and this foreclosure can become part of Plaintiff credit history, deficiency judgment, plaintiff has been personally injured.

138.  All the defendant's communications to the plaintiff was contrary to the FDCPA in at least 8 ways, as plaintiff did not have a mortgage and or note since the first foreclosure on or about December 2008.

139.  The FDCPA requires a "notice of debt" to contain certain information for the debtor and be mailed to the debtor within five days of first contacting the debtor about the debt. This lawsuit maintains all the defendants missed that five-day deadline in its communications with the plaintiff.

**FACTS REGARDING DEFENDANTS DOLAN, JAMES, GREGORY,**

**BARBARA, KATHLEEN, DAVID, CINDY**

140.    Defendants Dolan, James, Gregory, Barbara, Kathleen, David, Cindy are part of the law firm Dolan Connly.

141.    On April 24, 2018 Defendants BNY Dolan, James, Gregory, Barbara, Kathleen, David, Cindy mailed

plaintiff or caused to be mailed a Notice Under Massachusetts General Laws Chapter 186A based on BNY April 9,

2018 foreclosure of 572 Park Street Stoughton, Ma 02072.

142.    On April 24, 2018 Defendants BNY Dolan, James, Gregory, Barbara, Kathleen, David, Cindy also mailed

a Change in Ownership Occupant Questionnaire -Foreclosure document, this document stated that on April 9, 2018

BNY and its agent defendant SPS foreclosed and BNY became the new owners of the property located at 572 Park

Street, Stoughton, Ma 02072, on the back of the letter it stated were to send money, this document was Unfair &

Deceptive and was contrary of the FDCPA, MGL 93A and other Federal & State laws on its face (See Exhibit 12).

143.    This Change in Ownership Occupant Questionnaire -Foreclosure document also stated, "the representative

responsible for management of the subject premises and for the collection of rents and use and occupancy charges is

Cindy Silva." When due and requested, payment of rent and use of occupancy charges may be delivered to Cindy Silva

at P.O Box 815 Dracut, MA 01826, telephone number (978) 821-9806 Fax (617) 506-6019 between the hours of 9:00

am to 5 pm on all business days. Payment must be in the form of Cash, personal check or cashier's check made

payable to BNY and shall be made in person or by mail to the above-named agent at the address referenced above".

144.    Defendants Dolan, James, Gregory, Barbara, Kathleen, David, Cindy knew or should have known that this

document was contrary to FDCPA, MGL 93a, Massachusetts Debt Collection Regulation Act and outer Federal &

State laws.

145.    These Notices that defendants Dolan, James, Gregory, Barbara, Kathleen, David, Cindy filed or caused to

be filed was contrary to the FDCPA, MDCRA, MGL 93a and other state laws as the defendants had no right to do so.

146.    Defendants BNY, SPS, Dolan, James, Gregory Barbara, Kathleen, David, Cindy Silva, Orlans, Linda Orlans,

Alison Orlans knew or should have known that there was no legal entitlement to foreclose or send any

related notices regarding the April 9, 2018 foreclosure, this action was and is prohibited by the FDCPA, MGL 93a, Massachusetts Debt Collection Regulation Act and other Federal & State laws.

147.    As previously stated in this lawsuit that Defendants BNY, SPS, Dolan, Orlans, Linda Orlans, Alison Orlans, Dolan, James, Gregory, Barbara, Kathleen, David, Cindy, Jane Doe or John Doe had no right to foreclose on the property or proceed with any attempt to evict or disable the above mention property, as there was not a mortgage or note on the home due to the previous foreclosure that occurred on approximately Feb of 2008 and the 2005 acceleration of the mortgage..

148.    All actions defendants BNY, SPS, Dolan, James, Gregory Barbara, Kathleen, David, Cindy Silva, Orlans, Linda Orlans, Alison Orlans took regarding the April 9, 2018 foreclosure were contrary to the FDCPA, MGL 93a and other federal & state laws.

149.    On or about April 26, 2018 plaintiff sent the defendants BNY, Dolan, James, Gregory, Barbara, Kathleen, David, Cindy a MGL 93a demand notice, preservation notice, FDCPA validation request and notice of intent Defendant Dolan answered on or about May 2, 2019 (See Exhibit 13).

150.    Defendants BNY, Dolan, James, Gregory, Barbara, Kathleen, David, Cindy mailed filed or caused to be mailed or filed an eviction proceeding in the Stoughton Court regarding the April 9, 2019 foreclosure on the above property to the plaintiff on dates of April 15, 2019, April 29, 2019 these acts are contrary to the FDCPA, MGL 93a MDCRA and other Federal & State laws (See Exhibit 14).

151.    On or about March 29, 2019 BNY, Dolan, James, Gregory, Barbara, Kathleen, David, Cindy mailed filed or caused to be mailed a notice to quit to plaintiff they alleged it was delivered to the plaintiff by constable, plaintiff never received a copy from the constable plaintiff surveillance cameras show no constable on about March 29, 2019 at his residence.

152.    Plaintiff plans to propound evidence and depose the constable and the above defendants to flush out the truth.

153.    Defendants BNY, Dolan, James, Gregory, Barbara, Kathleen, David, Cindy actions have caused plaintiff personal injuries, loss of sleep, loss of consortium.

154.    The plaintiff sent all defendants BNY, SPS, Dolan, James, Gregory Barbara, Kathleen, David, Cindy Silva, Orlans, Linda Orlans, Alison Orlans debt validation notices and they all failed to validate the debt and

continued collection activities which is contrary to the FDCPA, MGL 93, MDCRA and other Federal & State Laws.

155.    The plaintiffs base their contention that the foreclosure sale is void because it violated § 15A the SJC has held that violations of certain statutory requirements pertaining to foreclosure sales pursuant to Massachusetts General Laws Chapter 244 would render them void.

156.    Defendants BNY, SPS, Dolan, James, Gregory Barbara, Kathleen, David, Cindy Silva, Orlans, Linda Orlans, Alison   Orlans, Jane Doe & John Doe failed to file an affidavit that showed compliance with the power of sale and "the law." (M.G.L. c. 244, § 14) were complied with.

## COUNT I

### VIOLATION OF FAIR DEBT COLLECTION
### PRACTICES ACT (FDCPA), 15 U.S.C. §1692
**BY DEFENDANT BNY, SPS, Dolan, James, Gregory Barbara, Kathleen, David, Cindy Silva, Orlans,**

**Linda Orlans, Alison   Orlans, Jane Doe & John Doe**

157. Plaintiff repeats and re-alleges each and every allegation set forth above as if reasserted and re-alleged here.

158. Plaintiff was in default when servicer Defendants began servicing his loan, the loan and Note was in default as of August 2005.

159.Defendants notices contained language that stated the Plaintiff is obligated to pay money, it also stated where the money should be sent.

160.FDCPA 15 U.S. Code § 1692f.Unfair practices

161.    Plaintiff is a consumer within the meaning of the FDCPA, 15 U.S.C. §1692

162.    Defendants are debt collectors within the meaning of FDCPA, 15 U.S.C. §1692

163.    Defendants violated the FDCPA, Defendants violations include, but are not limited to, the following:

164.    Defendants violated 15 U.S.C. §1692d by engaging in conduct the natural consequence of which is to harass, oppress, or abuse any person.

165.    Defendants violated 15 U.S.C. §1692e(2) by falsely representing the character, amount, or legal status of any debt.

166.    Defendants violated 15 U.S.C. §1692e(6) by sale or transfer of any interest in the debt will cause the consumer to lose any claim or defense to payment of the debt.

167.    Defendants violated 15 U.S.C. §1692e(8) by communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.

168.    Defendants violated 15 U.S.C. §1692e (10) using any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

169.    Defendants violated 15 U.S.C. §1692e (11) by the failure to disclose in the initial written communication with the consumer that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector.

170.    Defendants violated 15 U.S.C. §1692e (14) by the use of any name other than the true name of the debt collector's business.

171.    Defendants violated 15 U.S.C. §1692f (1) by the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

172.    Defendants violated 15 U.S.C. §1692f (6) taken or threatened to unlawfully repossess or disable the consumer's property.

173.    Defendants violated 15 U.S.C. §1692g by, within five days after the initial communication with Plaintiff in connection with the collection of any debt, failing to send Plaintiff a written notice containing a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector; a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and a statement that, upon the consumer's written request within the thirty-day period, the debt collector will

provide the consumer with the name and address of the original creditor, if different from the current creditor.

174.    Defendants violated § 1692 b(1) Contact of Third Party: Failed to identify themselves, or failed to state that collector is confirming or correcting location information

175.    Defendants violated § 1692 b(2) Contact of Third Party: Stated that the consumer owes any debt § 1692 b(3) Contact of Third Party: Contacted a person more than once, unless requested to do so

176.    Defendants violated § 1692 c(a)(3) At place of employment when knows that the employer prohibits such communications.

177.    Defendants violated § 1692 c(B) With anyone except consumer, consumer's attorney, or credit bureau concerning the debt.

178.    Defendants violated § 1692 e(10) Any false representation or deceptive means to collect a debt or obtain information about a consumer

179.    Defendants violated § 1692 Brought a legal action that they are not authorized to bring.


**WHEREFORE,** Plaintiff prays that this honorable Court award him damages from Defendants BNY, SPS, Dolan, James, Gregory Barbara, Kathleen, David, Cindy Silva ,Orlans, Linda Orlans, Alison   Orlans, Jane Doe & John Doe for the claims set forth herein including litigation fees and costs, sleep and emotional stress, personal injuries, Compensatory, Actual, Statutory damages of $1,000.00 pursuant to 15 U.S.C. §1692k(a)(2)(A) from each defendant;  and punitive damages, attorney fees, damages to plaintiffs credit and any other and further relief which is just and proper under the circumstances.

## COUNT II

**MORTGAGE POWER OF SALE**

**FAILURE TO COMPLY WITH PARAGRAPH 22 OF THE MORTGAGE**

**DEFENDANTS Dolan, James, Gregory, Cindy, Barbara, Kathleen,**

**David, BNY, Orlans, Linda, Alison, Jane Doe, John Doe**

27

180. Plaintiff repeats and re-alleges each and every allegation set forth above as if reasserted and re-alleged here.

181. Section 21. The following "power" shall be known as the "Statutory Power of Sale", and may be incorporated in any mortgage by reference:

### POWER OF SALE

But upon any default in the performance or observance of the foregoing or other condition, the mortgagee or his executors, administrators, successors or assigns may sell the mortgaged premises or such portion thereof as may remain subject to the mortgage in case of any partial release thereof, either as a whole or in parcels, together with all improvements that may be thereon, by public auction on or near the premises then subject to the mortgage, or, if more than one parcel is then subject thereto, on or near one of said parcels, or at such place as may be designated for that purpose in the mortgage, first complying with the terms of the mortgage and with the statutes relating to the foreclosure of mortgages by the exercise of a power of sale, and may convey the same by proper deed or deeds to the purchaser or purchasers absolutely and in fee simple; and such sale shall forever bar the mortgagor and all persons claiming under him from all right and interest in the mortgaged premises, whether at law or in equity.

**(Emphasis added)**

182. As emphasized above, the foreclosure by power of sale requires that a foreclosing bank must "comply with the terms of the mortgage …. G.L. c. 183, § 21

183. If a bank fails to strictly comply with the Power of sale then the foreclosure is **void** *U.S. BANK NATIONAL ASSOCIATION .v. John SCHUMACHER 467 Mass 421,428 (2014)* therefore the resulting foreclosure sale was wrongful, without legal effect, and void.

184. BNY, acting by and through defendants SPS, Orlans, Linda Orlans, Alison  Orlans, Jane Doe & John Doe serve and published statutorily mandated notices pursuant to GLM c 244, §§ 14 and 35A, asserting authority to foreclose by mortgage & note on April 9, 2018 that did not and does not exist.

185. All Defendants Said notices do not meet the statutory requirements and are void and without legal effect. The foreclosure conducted (April 9, 2018) based on improper mailed or published legal notices is wrongful, void, and without legal affect.

186. BNY, acting by and through defendants SPS, Orlans, Linda Orlans, Alison   Orlans, Jane Doe & John Doe represented to the Land Court authority to exercise a power of sale based on a mortgage & note that did not exist at the time of the representation. The misrepresentation result in void or voidable judgments of the Land Court.

187. The servicer of 572 Park Street Stoughton, Ma SPS sent a notice of default and a notice of acceleration on or about January 2018 at the time these notices were sent SPS was not the "Lender" as required by the Mortgage power of sale" clause.

188. Therefore the notice of default & acceleration was deficient, and the power of sale was not complied with prior to the April 9, 2018 foreclosure, therefore the April 9, 2018 foreclosure is void.

189. Plaintiff has suffered personal injuries, damages as a result of defendants' BNY, SPS, Dolan, James, Gregory Barbara, Kathleen, David, Cindy Silva, Orlans, Linda Orlans, Alison   Orlans, Jane Doe & John Doe conduct.

190. Plaintiff is entitled to a declaratory judgment determining that the foreclosure sale of the property mentioned in this law suit is void and setting aside the sale by defendants BNY, SPS, Dolan, James, Gregory Barbara, Kathleen, David, Cindy Silva, Orlans, Linda Orlans, Alison   Orlans, Jane Doe & John Doe recording the April 9, 2018 foreclosure sale was wrong and is void and should be set aside and cleared from the Norfolk Registry of deeds.

191.    The plaintiffs base their contention that the foreclosure sale is void because it violated § 15A the SJC has held that violations of certain statutory requirements pertaining to foreclosure sales pursuant to Massachusetts General Laws Chapter 244 would render them void.

**WHEREFORE,** plaintiff respectfully requests that this Honorable Court, Assume jurisdiction over this matter; Issue declaratory and/or injunctive relief setting aside the foreclosure sale (April 9, 2018) of above mentioned property as void or voidable and in violation of statute and public policy; Issue an injunction and/or declaratory relief to prevent further improper foreclosure related proceedings; issue an injunction preventing assessment or collection of attorney fees and charges for improper foreclosure and eviction proceedings based on the April 9, 2018 foreclosure; *issue a Temporary restraining order (TRO)* in the Stoughton Court regarding any eviction proceedings, Award damages, attorney fees, and costs, Issue a temporary and/or permanent injunction of the eviction proceedings pending against plaintiff based on the April 9, 2018 foreclosure, Award such other relief as the Court deems necessary in equity and the interests of justice.

## COUNT III

### VIOLATION OF CHAPTER 93A

**DEFENDANTS BNY, SPS, Dolan, James, Gregory Barbara, Kathleen, David, Cindy Silva, Orlans, Linda Orlans, Alison   Orlans, Jane Doe & John Doe**

192. Plaintiff repeats and re-alleges each and every allegation set forth above as if reasserted and re-alleged here.

193. Plaintiffs sent to the Defendants BNY, SPS, Dolan, James, Gregory Barbara, Kathleen, David, Cindy Silva, Orlans, Linda Orlans, Alison   Orlans, Jane Doe & John Doe by certified mail a written demand for relief, identifying the claimants and reasonably describing the unfair and deceptive acts or practices relied upon and injuries suffered. A copy of said demand is attached to complaint.

194. Defendants employed unfair or deceptive acts to collect the Debt, in violation of

M.G.L. c. 93A § 2.

195. All the Defendants' unfair and deceptive practices were willful and knowing within the meaning of M.G.L. c. 93A.

196. Beyond theories of vicarious liability and holding defendants BNY, SPS, Dolan, James, Gregory Barbara, Kathleen, David, Cindy Silva, Orlans, Linda Orlans, Alison   Orlans, Jane Doe & John Doe liable for their own acts and conduct towards Plaintiff.

197. The damages awarded should be multiplied under Ch. 93A, § 11] particularly where, as here, all the defendants' acts are willful, malicious and unjustified.

198. Defendant's failure to comply with these provisions constitutes an unfair or deceptive act under M.G.L. c. 93A § 9 and, as such, Plaintiff is entitled to double or treble damages plus reasonable attorney's fees.

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiff against Defendants for: (1) Statutory damages; (2) Actual damages equal to any unauthorized interest paid; (3) Treble damages for violations of G.L. c. 93A; (4) Attorneys' fees, litigation expenses and costs of suit; (5) Compensatory, nominal and punitive damages; (6) A declaration that Defendants may not add interest to a debt for a period prior to the date of 2005 acceleration and or Dec 2008 foreclosure demand or breach, and may not include prejudgment interest in the amount sought in a court; (7) actual and or statutory damages, and punitive damages, attorney's fees and costs. (8) An injunction prohibiting Defendants from demanding such; (8) Such other and further relief as is appropriate.

**COUNT IV**

**VIOLATION OF GL c. 244, §§ 35B and 35C**

**Defendants BNY, SPS, Dolan, James, Gregory Barbara, Kathleen, David, Cindy Silva, Orlans, Linda Orlans, Alison   Orlans, Jane Doe & John Doe**

199. Plaintiff repeats and re-alleges each and every allegation set forth above as if reasserted and re-alleged here.

200. All Defendants failed to state and file an affidavit that stated (That meets with respect to GL c. 244, §§ 35B and 35C.) it was made under oath or as a sworn statement, and that it was made of the affiant's own personal

knowledge. The affidavit did not include a detailed description of the basis of the affiant's claimed personal knowledge, with reference to the sources of information relied upon as well as a statement as to why those sources are accurate and reliable.

201. The affidavit was not signed under the pains and penalties of perjury and wasn't acknowledged with a jurat. With respect to § 35B, the affidavit did not recite either (1) that the requirements of § 35B have been complied with, or (2) that § 35B is not applicable to the foreclosed mortgage. With respect to § 35C, the affidavit did not recite that the foreclosing mortgagee is either (1) the holder of the promissory note secured by the foreclosed mortgage, or (2) the authorized agent of the holder of said promissory note.

202. The affidavit was not dated prior to the first publication date of the mortgagee's notice of foreclosure sale. :GL c. 244, §§ 35B and 35C became effective November 1, 2012. As such, no affidavit of compliance with these sections is required if first publication occurred prior to this date GL c. 244, §§ 35B and 35C apply only to certain mortgages securing 1-4 family residential property.

203. Defendants did not Comply with GL c. 244, §§ 35B and 35C they did not attest to in a single affidavit, or in separate affidavits.

204. The Defendant filed an *affidavit of sale* at the Norfolk Registry of Deeds on or about February 5th, 2019 the affidavit of sale is deficient as to **GL c. 244, §§ 35B and 35C** was not complied with therefore the foreclosure is void. Even if the affidavit of sale is not deficient Defendants affidavit fails with respect to GL c. 244, §§ 35B and 35C.

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiff against Defendants for: (1) Statutory damages; (2) Actual damages equal to any unauthorized interest paid; (3) Treble damages for violations of G.L. c. 93A; (4) Attorneys' fees, litigation expenses and costs of suit; (5) Compensatory, nominal and punitive damages; (6) A declaration that Defendants may not add interest to a debt for a period prior to the date of 2005 acceleration and or Dec 2008 foreclosure demand or breach, and may not include prejudgment interest in the amount sought in a court; (7) actual and or statutory damages, and punitive

damages, attorney's fees and costs. (8) An injunction prohibiting Defendants from demanding such; (8) Such other and further relief as is appropriate. (9) Emergency restraining order for all proceedings regarding the April 9, 2019 foreclosure in any court in Massachusetts.

## COUNT V

### Massachusetts Debt Collection Regulation Act 940 CMR 7:00

### Defendants BNY, SPS, Dolan, James, Gregory Barbara, Kathleen, David, Cindy Silva, Orlans, Linda Orlans, Alison  Orlans, Jane Doe & John Doe

205. Plaintiff repeats and re-alleges each and every allegation set forth above as if reasserted and re-alleged here

206. The purpose of 940 CMR 7.00 is to establish standards, by defining unfair or deceptive acts or practices, for the collection of debts from persons within the Commonwealth of Massachusetts.

207. MDCRA 940 CMR 7.00 applies only to the collection of debts, as defined in 940 CMR 7.00, and no conduct which is not the collection of debts or any part thereof is affected.

208. All Defendants  actions constituted an unfair or deceptive act or practice to engage in the following practices to collect or attempt to collect a debt from plaintiff that he has   :

Defendants action with regard to the April 9, 2018 foreclosure was contrary to the MDRCA **940 CMR** which triggered a violation of the MGL 93a. such as:

Any action that cannot legally be taken or that is not intended to be taken.

705: (2) It shall constitute an unfair or deceptive act or practice for a creditor to imply the fact of a debt, orally or in writing, to persons who reside in the household of a debtor, other than the debtor.

706: **(d)** Any communication of the fact of such debt by an attorney involved in litigation in connection with such debt, or after a judgment on the debt has been entered by a court of competent jurisdiction; **(e)** Any contact required by law to be made by a creditor engaged in collection activities, including notices required prior or subsequent to repossession.

707:(6) Any representation that an existing obligation of a debtor may be increased by the addition of attorney's fees, investigation fees, service fees, or any other fees or charges, if in fact such fees or charges may not legally be added to the existing obligation. **(8)** Any false, deceptive, or misleading representation, communication, or means in connection with the collection of any debt or to obtain information concerning a debtor. **(16)** The collection of any amount (including interest, fees, charges or expenses incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law, REGULATORY AUTHORITY 940 CMR 7.00: M.G.L. c. 93A, § 2(c).

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiff against Defendants and find that all defendants actions under the **Massachusetts Debt Collection Regulation Act 940 CMR 7:00 et seq.** (MDCRA): constituted an unfair or deceptive act or practice which triggered a violation of MGL 93a.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all issues so triable as a matter of law.

Respectfully submitted this 28th day of May 2019

Paul Jones

/s/ Paul Jones

572 Park Street

Stoughton, Ma 02072

PJ22765@gmail.com

May 28, 2019

# VERIFICATION OF COMPLAINT AND CERTIFICATION

## STATE OF MASSACHUSETTS

### Plaintiff, Paul Jones, states as follows

I am the Plaintiff in this civil proceeding.

I believe that this civil Complaint is well grounded in fact and warranted by existing law or by a good faith argument for the extension, modification or law.

I believe that this civil complaint is not interposed for any improper purpose, such as to harass any Defendant(s), cause unnecessary delay to any Defendant(s), or create a needless increase in the cost of litigation to any Defendant(s), named in this Complaint. I have filed this complaint in good faith and solely for the purposes set forth in it. Each and every exhibit which has been attached to this complaint is true and correct copy of the original.

Except for clearly indicated redactions made by me where appropriate, I have not altered, changed, modified or fabricated these exhibits, except that some of the attached exhibits may contain some of my own handwritten notations.

Pursuant to 28 U.S.C. § 1746(2), I, Paul Jones, hereby declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.

Paul Jones

/s/ Paul Jones

May 28, 2019

35

Min: �ना    Loan Number: █████

# ADJUSTABLE RATE NOTE
### (6-Month LIBOR Index - Rate Caps)
### (Assumable during Life of Loan) (First Business Day of Preceding Month Lookback)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

JUNE 22, 2004              TUSTIN              CALIFORNIA
[Date]                     [City]             [State]

572 PARK STREET, STOUGHTON, MASSACHUSETTS 02072
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $274,550.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is OPTIMA MORTGAGE CORPORATION, A CALIFORNIA CORPORATION
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 7.450 %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on AUGUST 1 2004. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on JULY 1, 2034 I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 15941 REDHILL AVENUE SUITE #100, TUSTIN, CALIFORNIA 92780
or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $1,910.30 . This amount may change.

Borrower Initials: _____  _____  _____  _____  _____

MULTISTATE ADJUSTABLE RATE NOTE - 6-Month LIBOR Index
(Assumable During Life of Loan) (First Business Day Lookback)
Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 5520 3/04              Page 1 c

DocMagic

05-Mar-2013 02:13 PM Bank of America 213-345-1002 3/8

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the 1st day of JULY, 2006 , and may change on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the six month London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal.* The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding SIX AND 950/1000 percentage point(s) ( 6.950 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 8.950 % or less than 6.950 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE AND 500/1000 percentage point(s) ( 1.500 %) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 14.450 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY ** See attached Prepayment Note Addendum.

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

Borrower Initials: ___  ___  ___  ___  ___

MULTISTATE ADJUSTABLE RATE NOTE - 6-Month LIBOR Index
(Assumable During Life of Loan) (First Business Day Lookback)
Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 5520 3/04                    Page 2 of 5

DocMagic *eForms* 800-649-1362
www.docmagic.com

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7.   BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of   15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   3 . 000   % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver by Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations,

Borrower Initials: P.J.

MULTISTATE ADJUSTABLE RATE NOTE - 6-Month LIBOR Index
(Assumable During Life of Loan) (First Business Day Lookback)
Single Family—Freddie Mac MODIFIED INSTRUMENT
Form 5520 3/04                                          Page 3 of 5

DocMagic *eForms* 800-649-1362
www.docmagic.com

38

including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower Initials: _P.J._

MULTISTATE ADJUSTABLE RATE NOTE - 6-Month LIBOR Index
(Assumable During Life of Loan) (First Business Day Lookback)
Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 5520 3/04                                Page 4 of 5

DocMagic *eForms* 800-649-1362
www.docmagic.com

39

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)          _____ (Seal)
PAUL JONES        -Borrower                          -Borrower


_____ (Seal)          _____ (Seal)
               -Borrower                          -Borrower


_____ (Seal)          _____ (Seal)
               -Borrower                          -Borrower


*[Sign Original Only]*

MULTISTATE ADJUSTABLE RATE NOTE - 6-Month LIBOR Index
(Assumable During Life of Loan) (First Business Day Lookback)
Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 5520 3/04                                Page 5 of 5

DocMagic eForms 800-649-1362
www.docmagic.com

## ALLONGE TO NOTE

LOAN NUMBER: ███████

LOAN AMOUNT: $274,550.00

PROPERTY ADDRESS: 572 PARK STREET, STOUGHTON, MASSACHUSETTS 02072

ALLONGE TO NOTE DATED JUNE 22, 2004

IN FAVOR OF OPTIMA MORTGAGE CORPORATION

AND EXECUTED BY PAUL JONES

PAY TO THE ORDER OF:
COUNTRYWIDE DOCUMENT CUSTODY SERVICES, A DIVISION OF TREASURY BANK, N.A.

WITHOUT RECOURSE OPTIMA MORTGAGE CORPORATION

BY:

TITLE: Karen Hellmich
V.P. of Operations

ALLONGE TO NOTE
05/08/04

DocMagic €Ⓡuⓡⓣⓔ ™
www.docmagic.com

41

PAY TO THE ORDER OF

COUNTRYWIDE HOME LOANS INC.

WITHOUT RECOURSE

COUNTRYWIDE DOCUMENT CUSTODY SERVICES,
A DIVISION OF TREASURY BANK, NA

BY _____
LAURIE MEDER
VICE PRESIDENT

PAY TO THE ORDER OF

_____

WITHOUT RECOURSE
COUNTRYWIDE HOME LOANS, INC.

BY _____
David A. Spector
Managing Director,

42

# PREPAYMENT ADDENDUM TO NOTE

Loan Number: ███████

Date: JUNE 22, 2004

Borrower(s): PAUL JONES

THIS PREPAYMENT ADDENDUM TO NOTE (the "Addendum") is made this      22nd      day of
JUNE, 2004           , and is incorporated into and shall be deemed to amend and supplement
that certain promissory note (the "Note") made by the undersigned ("Borrower") in favor of  OPTIMA
MORTGAGE CORPORATION

("Lender") and dated the same date as this Addendum.  Repayment of the Note is secured by a Mortgage, Deed of
Trust, or Security Deed (the "Security Instrument") given by Borrower in favor of Lender and dated the same date
as this Addendum.  To the extent that the provisions of this Addendum are inconsistent with the provisions of the
Note, the provisions of this Addendum shall supersede the inconsistent provisions of the Note.

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Note, Borrower
and Lender further covenant and agree as follows:

Section   5        of the Note is amended to read in its entirety as follows:

### 5   . BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE

I have the right to make payments of Principal at any time before they are due.  A payment
of Principal only is known as a "Prepayment."  When I make a Prepayment, I will tell the Note
Holder in writing that I am doing so.  I may not designate a payment as a Prepayment if I have not
made all the monthly payments due under the Note.

The Note Holder will use my Prepayments to reduce the amount of Principal that I owe
under the Note.  However, the Note Holder may apply my Prepayment to the accrued and unpaid
interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount
of the Note.  If I make a partial Prepayment, there will be no changes in the due dates of my
monthly payment unless the Note Holder agrees in writing to those changes.

If the Note provides for changes in the interest rate, my partial Prepayment may reduce the
amount of my monthly payments after the first Change Date following my partial Prepayment.
However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

If I make a full Prepayment of the Note before the date fixed for payment, I will at the
same time pay a Prepayment charge equal to the balance of the first year's interest or three (3)
months' interest, whichever is less; provided, however, that if I make a full Prepayment within
TWENTY-FOUR   (   24   ) months from the date of the Note for the purpose of refinancing
with another financial institution, I will pay an additional Prepayment charge equal to three (3)
months' interest.



P.J.

43

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Addendum.

Borrower PAUL JONES                           Date

Borrower                                       Date

Borrower                                       Date

Borrower                                       Date

Borrower                                       Date

Borrower                                       Date

Bk 22224 Pg219 #35864
03-29-2005 @ 09:51a

████████ MORTGAGE CORPORATION
15941 REDHILL AVENUE SUITE #100
TUSTIN, CALIFORNIA 92780
Loan Number: 0640520008

RECEIVED AND RECORDED
NORFOLK COUNTY
REGISTRY OF DEEDS
DEDHAM, MA
CERTIFY
*William P. O'Donnell*
WILLIAM P. O'DONNELL, REGISTER

*Prepared By:*
*Optima mortgage Corp*
*15941 Redhill Ave suite #100*
*Tustin, CA 92780*

~~Prepared by~~ & Return to:
TransContinental Title Co.
4033 Tampa Rd Suite 101
Oldsmar, FL 34677
800-225-7897

*572 PARK ST, STOUGHTON*

--------------- [Space Above This Line For Recording Data] ---------------

# MORTGAGE

MIN: ████████████

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "Security Instrument" means this document, which is dated JUNE 22, 2004 , together with all Riders to this document.
**(B)** "Borrower" is PAUL JONES *A unmarried person*

*797470-42*

Borrower is the mortgagor under this Security Instrument.
**(C)** "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D)** "Lender" is OPTIMA MORTGAGE CORPORATION

Lender is a CALIFORNIA CORPORATION organized
and existing under the laws of CALIFORNIA
Lender's address is 15941 REDHILL AVENUE SUITE #100, TUSTIN, CALIFORNIA 92780

**(E)** "Note" means the promissory note signed by Borrower and dated JUNE 22, 2004
The Note states that Borrower owes Lender TWO HUNDRED SEVENTY-FOUR THOUSAND FIVE HUNDRED FIFTY AND 00/100 Dollars (U.S. $ 274,550.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than JULY 1, 2034
**(F)** "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
**(G)** "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

Borrower Initials: *PJ* ___ ___ ___ ___ ___ ___

MASSACHUSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS *DocMagic* *eForms* 800-649-1362
Form 3022 01/01                               Page 1 of 13                                www.docmagic.com

45    *20*

(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [X] Other(s) [specify] |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | PREPAYMENT RIDER TO SECURITY INST |

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) **"Escrow Items"** means those items that are described in Section 3.

(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the

COUNTY of NORFOLK :

[Type of Recording Jurisdiction]     [Name of Recording Jurisdiction]

Borrower Initials: _____  _____  _____  _____  _____  _____

MASSACHUSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS   *DocMagic eForms* 800-649-1362
Form 3022 01/01                               Page 2 of 13                              www.docmagic.com

46

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N. #: MAP 70 MAP 42

which currently has the address of 572 PARK STREET

[Street]

STOUGHTON                                , Massachusetts    02072                                ("Property Address"):
      [City]                                                              [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due

Borrower Initials: _____ _____  _____ _____  _____ _____  _____ _____

MASSACHUSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS    *DocMagic eForms* 800-649-1362
Form 3022 01/01                                        Page 3 of 13                                        www.docmagic.com

47

under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

    **2.    Application of Payments or Proceeds.**  Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

    If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

    Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

    **3.    Funds for Escrow Items.**  Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

    Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

    The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

Borrower Initials: _____  _____  _____  _____  _____  _____

MASSACHUSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS    *DocMagic eForms*  800-649-1362
Form 3022 01/01                                   Page 4 of 13                                   *www.docmagic.com*

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such

Borrower Initials: _____ _____ _____ _____ _____ _____

MASSACHUSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS    *DocMagic eForms* 800-649-1362
Form 3022 01/01                                    Page 5 of 13                                        www.docmagic.com

49

policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal

Borrower Initials: _____  _____  _____  _____  _____  _____

proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share

Borrower Initials: _____ _____ _____ _____ _____ _____

MASSACHUSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS *DocMagic eForms* 800-649-1362
Form 3022 01/01                          Page 7 of 13                          www.docmagic.com

51

of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

Borrower Initials: _____  _____  _____  _____  _____

MASSACHUSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS   *DocMagic* ⓔⓕⓞⓡⓜⓢ  *800-649-1362*
Form 3022 01/01                                  Page 8 of 13                                  *www.docmagic.com*

52

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Borrower Initials: _____  _____  _____  _____  _____  _____

MASSACHUSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS  *DocMagic* 800-649-1362
Form 3022 01/01                                      Page 9 of 13                                      www.docmagic.com

53

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations

Borrower Initials: _____  _____  _____  _____  _____  _____

MASSACHUSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS  *DocMagic* 800-649-1362
Form 3022 01/01                                    Page 10 of 13                              *www.docmagic.com*

54

to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances.  As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property.  Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property.  If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS.  Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.  If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law.  Lender shall be

Borrower Initials: _____  _____  _____  _____  _____  _____  _____

entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
PAUL JONES                -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

Witness:

_____
Zora A. mead
Witness

Witness:

_____
Jack Smith
Jack Smith

MASSACHUSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS  DocMagic eForms 800-649-1362
Form 3022 01/01                         Page 12 of 13                                    www.docmagic.com

Commonwealth of Massachusetts

County of ~~NORFOLK~~ *Hampshire*

On this *22nd* day of *June, 2004*                , before me, the undersigned notary public, personally appeared  PAUL  JONES  *A unmarried person*

proved to me through satisfactory evidence of identification, which were  *license*                '

to be the person whose name is signed on the preceding or attached document, and acknowledged to me that (he) (she) signed it voluntarily for its stated purpose.

☐ (as partner for
    a corporation)                                                                      '

☐ (as                                              for
                                                                                  , a corporation)

☐ (as attorney in fact for
    the principal)                                                                  '

☐ (as                                              for
                                                                              , (a) (the)
    )

_____
Notary Public

*LORi A. MEAD*
_____
Notary Public (Printed Name)

(Seal)                    My commission expires: *Dec 19, 2008*

```
LORI A. MEAD
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires Dec. 19, 2008
```

MASSACHUSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS   *DocMagic eForms* 800-649-1362
Form 3022 01/01                          Page 13 of 13                          *www.docmagic.com*

57

# EXHIBIT "A"

10-00466289

THE LAND IN STOUGHTON WITH THE BUILDINGS THEREON, ON
THE NORTHEASTERLY SIDE OF PARK STREET, AND BOUNDED:

BEGINNING ON PARK STREET AT A POINT SEVENTY-FIVE (75)
FEET NORTHERLY FROM LAND NOW OR LATE OF OLD COLONY
RAILROAD COMPANY, NOW OR FORMERLY OCCUPIED BY THE
STOUGHTON LUMBER COMPANY; THENCE RUNNING
NORTHEASTERLY BY LAND NOW OR FORMERLY OF AUGUST O.
LINDELOF AND EMMA J. LINDELOF BY A LINE PARALLEL WITH
AND SEVENTY-FIVE (75) FEET DISTANCE FROM SAID
RAILROAD LAND ONE HUNDRED AND FIFTY (150) FEET TO A
CORNER; THENCE RUNNING NORTHERLY BY SAID AUGUST O.
LINDELOF AND EMMA J. LINDELOF LAND BY A LINE PARALLEL
WITH PARK STREET ONE HUNDRED AND TEN FEET TO A
CORNER; THENCE RUNNING SOUTHWESTERLY BY LAND NOW OR
FORMERLY OF SAID AUGUST O. LINDELOF AND EMMA J.
LINDELOF BY A LINE PARALLEL WITH THE FIRST COURSE ONE
HUNDRED AND FIFTY (150) FEET TO PARK STREET; THENCE
SOUTHERLY BY PARK STREET ONE HUNDRED AND TEN (110)
FEET TO POINT OF BEGINNING.

ALSO:

A CERTAIN PARCEL OF LAND SITUATE IN SAID STOUGHTON,
MASS., AND BEING LOT 3 AS SHOWN ON A PLAN ENTITLED
"PLAN OF LAND IN STOUGHTON, MASS.", DATED JANUARY 18,
1968, DULY RECORDED. CONTAINING ACCORDING TO SAID
PLAN 7,691 SQUARE FEET.

ALSO:

A CERTAIN PARCEL OF LAND SITUATED ON THE
NORTHEASTERLY SIDE OF PARK STREET IN SAID STOUGHTON,
MASSACHUSETTS AND BEING DESCRIBED AS FOLLOWS:

BEGINNING AT A STAKE ON THE SOUTHERLY CORNER OF LAND
OF "RUTH E. CURTIS" AND BEING SHOWN ON A PLAN

## EXHIBIT "A"

ENTITLED "PLAN OF LAND IN STOUGHTON, MASS." DATED
JANUARY 18, 1968 AND RECORDED WITH NORFOLK DEEDS,
BOOK 4490, PAGE 69, THENCE RUNNING BY PARK STREET AS
SHOWN ON SAID PLAN, S 40 DEGREES 54 MINUTES 11
SECONDS E, 75 FEET TO A STAKE;

THENCE TURNING AND RUNNING N 46 DEGREES 19 MINUTES 29
SECONDS E 220 FEET TO A POINT;

THENCE TURNING AT AN APPROXIMATE RIGHT ANGLE AND
RUNNING NORTHWESTERLY A DISTANCE OF 75 FEET, MORE OR
LESS, TO A POINT AT THE NORTHEASTERLY CORNER OF
DISTANCE 75 FEET, MORE OR LESS, TO A POINT AT THE
NORTHEASTERLY CORNER OF LOT 3 SHOWN ON SAID PLAN,
SAID POINT BEING DESIGNATED ON SAID PLAN AS "C.B. TO
BE SET,";

THENCE TURNING AND RUNNING BY LOT 3 AND LAND OF "RUTH
E. CURTIS" AS SHOWN ON SAID PLAN, S 46 DEGREES 19
MINUTES 29 SECONDS W., 220 FEET TO THE POINT OF
BEGINNING.

BEING THE SAME PROPERTY CONVEYED TO PAUL JONES BY
DEED FROM EDWARD G. MATTINGLY AND ELAINE R. MATTINGLY
RECORDED 06/21/2002 IN DEED BOOK 16766, PAGE 1, IN
THE REGISTRY OF DEEDS PLAN FOR NORFOLK COUNTY,
MASSACHUSETTS.

Min: ▮▮▮▮▮▮▮▮▮▮        Loan Number: ▮▮▮▮▮▮▮▮▮

# ADJUSTABLE RATE RIDER
### (6-Month LIBOR Index - Rate Caps)
### (Assumable during Life of Loan) (First Business Day of Preceding Month Lookback)

THIS ADJUSTABLE RATE RIDER is made this 22nd day of JUNE, 2004 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure the Borrower's Adjustable Rate Note (the "Note") to  OPTIMA MORTGAGE
CORPORATION, A CALIFORNIA CORPORATION
(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

572 PARK STREET, STOUGHTON, MASSACHUSETTS 02072
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST
RATE AND THE MONTHLY PAYMENT.  THE NOTE LIMITS THE AMOUNT THE
BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE
MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.**  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of      7.450 %.  The Note provides for changes
in the interest rate and the monthly payments, as follows:

## 4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The interest rate I will pay may change on the 1st  day of JULY, 2006 ,
and may change on that day every sixth month thereafter.  Each date on which my interest rate could change
is called a "Change Date."
(B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index.  The "Index" is the
six month London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for
six-month U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*.
The most recent Index figure available as of the first business day of the month immediately preceding the
month in which the Change Date occurs is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index which is based upon
comparable information.  The Note Holder will give me notice of this choice.

Borrower Initials: _____  _____  _____  _____  _____

MULTISTATE ADJUSTABLE RATE RIDER - 6-Month LIBOR Index
(Assumable During Life of Loan) (First Business Day Lookback)
Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 5120 3/04                    Page 1 of 3

DocMagic *EFarms* 800-649-1362
www.docmagic.com

60

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding SIX AND 950/1000 percentage point(s) ( 6.950 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 8.950 % or less than 6.950 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE AND 500/1000 percentage point(s) ( 1.500 %) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 14.450 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

Borrower Initials: _R.J_ ___ ___ ___ ___ ___

MULTISTATE ADJUSTABLE RATE RIDER - 6-Month LIBOR Index
(Assumable During Life of Loan) (First Business Day Lookback)
Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 5120 3/04                                                     Page 2 of 3

DocMagic *eRailer* 800-649-1362
www.docmagic.com

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)      _____ (Seal)
PAUL JONES                       -Borrower                                       -Borrower

_____ (Seal)      _____ (Seal)
                                 -Borrower                                       -Borrower

_____ (Seal)      _____ (Seal)
                                 -Borrower                                       -Borrower

MULTISTATE ADJUSTABLE RATE RIDER - 6-Month LIBOR Index
(Assumable During Life of Loan) (First Business Day Lookback)
Single Family--Freddie Mac MODIFIED INSTRUMENT
Form 5120 3/04                    Page 3 of 3

DocMagic eForms 800-649-1362
www.docmagic.com

62

# PREPAYMENT RIDER

Loan Number: ████████

Date: JUNE 22, 2004

Borrower(s): PAUL JONES

THIS PREPAYMENT RIDER (the "Rider") is made this 22nd day of JUNE , 2004 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure repayment of Borrower's promissory note (the "Note") in favor of OPTIMA MORTGAGE CORPORATION

("Lender"). The Security Instrument encumbers the Property more specifically described in the Security Instrument and located at

572 PARK STREET, STOUGHTON, MASSACHUSETTS 02072

[Property Address]

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.    PREPAYMENT CHARGE**
The Note provides for the payment of a prepayment charge as follows:

**5    . BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE**
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.
The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under the Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes.
If the Note provides for changes in the interest rate, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

---

MASSACHUSETTS PREPAYMENT RIDER
6/03

Page 1 of 2

DocMagic *CFerms* 800-649-1362
www.docmagic.com

*P.J.*

If I make a full Prepayment of the Note before the date fixed for payment, I will at the same time pay a Prepayment charge equal to the balance of the first year's interest or three (3) months' interest, whichever is less; provided, however, that if I make a full Prepayment within   TWENTY-FOUR
(24   ) months from the date of the Note for the purpose of refinancing with another financial institution, I will pay an additional Prepayment charge equal to three (3) months' interest.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Rider.


_____ (Seal)         _____ (Seal)
PAUL JONES                     -Borrower                                        -Borrower


_____ (Seal)         _____ (Seal)
                               -Borrower                                        -Borrower


_____ (Seal)         _____ (Seal)
                               -Borrower                                        -Borrower

## EXHIBIT "A"

ENTITLED "PLAN OF LAND IN STOUGHTON, MASS." DATED
JANUARY 18, 1968 AND RECORDED WITH NORFOLK DEEDS,
BOOK 4490, PAGE 69, THENCE RUNNING BY PARK STREET AS
SHOWN ON SAID PLAN, S 40 DEGREES 54 MINUTES 11
SECONDS E, 75 FEET TO A STAKE;

THENCE TURNING AND RUNNING N 46 DEGREES 19 MINUTES 29
SECONDS E 220 FEET TO A POINT;

THENCE TURNING AT AN APPROXIMATE RIGHT ANGLE AND
RUNNING NORTHWESTERLY A DISTANCE OF 75 FEET, MORE OR
LESS, TO A POINT AT THE NORTHEASTERLY CORNER OF
DISTANCE 75 FEET, MORE OR LESS, TO A POINT AT THE
NORTHEASTERLY CORNER OF LOT 3 SHOWN ON SAID PLAN,
SAID POINT BEING DESIGNATED ON SAID PLAN AS "C.B. TO
BE SET,";

THENCE TURNING AND RUNNING BY LOT 3 AND LAND OF "RUTH
E. CURTIS" AS SHOWN ON SAID PLAN, S 46 DEGREES 19
MINUTES 29 SECONDS W., 220 FEET TO THE POINT OF
BEGINNING.

BEING THE SAME PROPERTY CONVEYED TO PAUL JONES BY
DEED FROM EDWARD G. MATTINGLY AND ELAINE R. MATTINGLY
RECORDED 06/21/2002 IN DEED BOOK 16766, PAGE 1, IN
THE REGISTRY OF DEEDS PLAN FOR NORFOLK COUNTY,
MASSACHUSETTS.

RECEIVED AND RECORDED
NORFOLK COUNTY
REGISTRY OF DEEDS
DEDHAM, MA

CERTIFY

*William P. O'Donnell*
WILLIAM P. O'DONNELL, REGISTER

MASSACHUSETTS STATE EXCISE TAX
Norfolk Registry of Deeds
Date: 09-11-2018 @ 11:24am
Ctl#: 452          Doc#: 81036
Fee: $1,128.60    Cons: $247,500.00

**FORECLOSURE DEED**

Property Address: 572 Park Street, Stoughton, MA 02072

The Bank of New York Mellon, f/k/a, the Bank of New York, as Trustee for CWABS, Inc., Asset-Backed Certificates, Series 2004-7, having its usual place of business at c/o Select Portfolio Servicing, Inc., 3217 South Decker Lake Drive, Salt Lake City, Utah 84119, the present holder of a mortgage from Paul Jones to Mortgage Electronic Registration Systems, Inc., as nominee for Optima Mortgage Corporation, its successors and assigns, dated June 22, 2004 and recorded with the Norfolk County Registry of Deeds in Book 22224, Page 219, assigned to Bank of New York as Trustee for the Certificate Holders, CWABS, Inc., Asset-Backed Certificates, Series 2004-7 by virtue of an assignment dated January 25, 2008 and recorded in Book 25529, Page 356, assigned to Bank of New York as Trustee for the Certificate Holders, CWABS, Inc., Asset-Backed Certificates, Series 2004-7 by virtue of an assignment dated October 21, 2008 and recorded in Book 26162, Page 573 by the power conferred by said mortgage and by every other power, for TWO HUNDRED FORTY-SEVEN THOUSAND FIVE HUNDRED DOLLARS AND 00/100 ($247,500.00) paid, grants to:

The Bank of New York Mellon, f/k/a, the Bank of New York, as Trustee for CWABS, Inc., Asset-Backed Certificates, Series 2004-7, with an address of c/o Select Portfolio Servicing, Inc., 3217 South Decker Lake Drive, Salt Lake City, Utah 84119, the premises conveyed by said mortgage.

WITNESS the execution of said corporation on this _16_ day of _August_, 2018.

See Limited Power of Attorney recorded herewith

The Bank of New York Mellon, f/k/a, the Bank of New York, as Trustee for CWABS, Inc., Asset-Backed Certificates, Series 2004-7, by Select Portfolio Servicing, Inc., as attorney-in-fact

By: _____

Name: _____Otto Castillo_____

Title: __Document Control Officer__
Select Portfolio Servicing, Inc.

Date: ____8/16/2018____

STATE OF UTAH            )
COUNTY OF SALT LAKE      )

On this _16_ day of _Aug._, 20_18_, before me, _Molina Fresquez_, a notary public, personally appeared _Otto Castillo_ **Personally Known**, a __Document Control Officer__ of Select Portfolio Servicing, Inc., proved on the basis of satisfactory evidence to be the person whose name is subscribed to this instrument, and acknowledged that he/she executed the same for its stated purpose as the free act and deed of The Bank of New York Mellon, f/k/a, the Bank of New York, as Trustee for CWABS, Inc., Asset-Backed Certificates, Series 2004-7. Witness my hand and official seal.

_____
Notary Public

MOLINA FRESQUEZ
Notary Public State of Utah
My Commission Expires on:
January 28, 2019
Comm. Number 681384

17-011115/FORD_DR                    1                    MA006.A003

*4*

66

Affidavit of Sale

I, Jody DiGiacomandrea, Esq., Employee, Authorized Signatory, Real Property of Orlans PC, as attorney for The Bank of New York Mellon, f/k/a, the Bank of New York, as Trustee for CWABS, Inc., Asset-Backed Certificates, Series 2004-7 ("Lender") named in the foregoing deed, make oath and say that the principal, interest and other obligations mentioned in mortgage from above referred to were not paid or tendered or performed when due or prior to the sale, and that this office caused to be published on the 16th day of March, 2018, on the 23rd day of March, 2018 and on the 30th day of March, 2018, in the Stoughton Journal (was Chronicle), a newspaper with general circulation in Stoughton, a copy of which is attached hereto as Exhibit A.

This office has complied with Chapter 244, Section 14 of Massachusetts General Laws, as amended, by mailing the required notices by certified mail, return receipt requested.

This office has complied with Chapter 209, Section 18.21A of Code of Massachusetts Regulations, as amended, by mailing the required certification and supporting documentation by certified mail, return receipt requested.

Pursuant to said notice at the time and place therein appointed, the Lender sold the mortgaged premises at public auction by Robert A. Decelle, a licensed auctioneer, of Towne Auction Company LLC, to the highest bidder The Bank of New York Mellon, f/k/a, the Bank of New York, as Trustee for CWABS, Inc., Asset-Backed Certificates, Series 2004-7, with an address of c/o Select Portfolio Servicing, Inc., 3217 S. Decker Lake Dr, Salt Lake City, UT 84119, for the sum of TWO HUNDRED FORTY-SEVEN THOUSAND FIVE HUNDRED DOLLARS AND 00/100 ($247,500.00) paid, being the highest bid made therefor at said auction.

See Power of Attorney recorded herewith

For signatory authority, see Delegation of Authority and Appointment registered with the Norfolk County District of the Land Court at Document Number 1397044

Jody DiGiacomandrea, Esq., Employee, Authorized Signatory, Real Property of Orlans PC

*RE: 572 Park Street, Stoughton, MA 02072*

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS

On this ___10th___ day of ___September___, 20_18_, before me, the undersigned Notary Public, personally appeared, Jody DiGiacomandrea, Esq., Employee, Authorized Signatory, Real Property of Orlans PC, proved to me through satisfactory evidence of identification, which was personal knowledge, to be the person whose name is signed on the preceding or attached document, and who swore or affirmed to me that the contents of this document are truthful and accurate to the best of his/her knowledge and belief.

Danielle L. Richards, Notary Public

My Commission Expires: 9/7/2023

EXHIBIT "A"

ATTACHED TO AND FORMING A PART OF THE FORECLOSURE DEED
FOR PROPERTY AT 572 PARK STREET, STOUGHTON, MA 02072

572 Park Street, Stoughton

**LEGAL NOTICE**
**MORTGAGEE'S NOTICE OF SALE OF REAL ESTATE**

By virtue and in execution of the Power of Sale contained in a certain Mortgage given by Paul Jones to Mortgage Electronic Registration Systems, Inc., as nominee for Optima Mortgage Corporation, its successors and assigns, dated June 22, 2004 and recorded with the Norfolk County Registry of Deeds at Book 22224, Page 219 subsequently assigned to Bank of New York as Trustee for the Certificate Holders, CWABS, Inc., Asset-Backed Certificates, Series 2004-7 by Mortgage Electronic Registration Systems, Inc., as nominee for Optima Mortgage Corporation, its successors and assigns by assignment recorded in said Norfolk County Registry of Deeds at Book 25529, Page 356 and subsequently assigned to Bank of New York as Trustee for the Certificate Holders, CWABS, Inc., Asset-Backed Certificates, Series 2004-7 by Mortgage Electronic Registration Systems, Inc., as nominee for Optima Mortgage Corporation by assignment recorded in said Norfolk County Registry of Deeds at Book 26162, Page 573; of which Mortgage the undersigned is the present holder for breach of the conditions of said Mortgage and for the purpose of foreclosing same will be sold at Public Auction at 10:00 AM on April 9, 2018 at 572 Park Street, Stoughton, MA, all and singular the premises described in said Mortgage, to wit:

THE LAND IN STOUGHTON WITH THE BUILDINGS THEREON, ON THE NORTHEASTERLY SIDE OF PARK STREET, AND BOUNDED: BEGINNING ON PARK STREET AT A POINT SEVENTY-FIVE (75) FEET NORTHERLY FROM LAND NOW OR LATE OF OLD COLONY RAILROAD COMPANY, NOW OR FORMERLY OCCUPIED BY THE STOUGHTON LUMBER COMPANY; THENCE RUNNING NORTHEASTERLY BY LAND NOW OR FORMERLY OF AUGUST O. LINDELOF AND EMMA J. LINDELOF BY A LINE PARALLEL WITH AND SEVENTY-FIVE (75) FEET DISTANCE FROM SAID RAILROAD LAND ONE HUNDRED AND FIFTY (150) FEET TO A CORNER; THENCE RUNNING NORTHERLY BY SAID AUGUST O. LINDELOF AND EMMA J. LINDELOF LAND BY A LINE PARALLEL WITH PARK STREET ONE HUNDRED AND TEN FEET TO A CORNER; THENCE RUNNING SOUTHWESTERLY BY LAND NOW OR FORMERLY OF SAID AUGUST O. LINDELOF AND EMMA J. LINDELOF BY A LINE PARALLEL WITH THE FIRST COURSE ONE HUNDRED AND FIFTY (150) FEET TO PARK STREET; THENCE SOUTHERLY BY PARK STREET ONE HUNDRED AND TEN (110) FEET TO POINT OF BEGINNING.
ALSO:
A CERTAIN PARCEL OF LAND SITUATE IN SAID STOUGHTON, MASS., AND BEING LOT 3 AS SHOWN ON A PLAN ENTITLED "PLAN OF LAND IN STOUGHTON, MASS.", DATED JANUARY 18, 1968, DULY RECORDED. CONTAINING ACCORDING TO SAID PLAN 7,691 SQUARE FEET.
ALSO:
A CERTAIN PARCEL OF LAND SITUATED ON THE NORTHEASTERLY SIDE OF PARK STREET IN SAID STOUGHTON, MASSACHUSETTS AND BEING DESCRIBED AS FOLLOWS: BEGINNING AT A STAKE ON THE SOUTHERLY CORNER OF LAND OF "RUTH E. CURTIS" AND BEING SHOWN ON A PLAN

ENTITLED "PLAN OF LAND IN STOUGHTON, MASS." DATED JANUARY 18, 1968 AND RECORDED WITH NORFOLK DEEDS, BOOK 4490, PAGE 69, THENCE RUNNING BY PARK STREET AS SHOWN ON SAID PLAN, S 40 DEGREES 54 MINUTES 11 SECONDS E, 75 FEET TO A STAKE;
THENCE TURNING AND RUNNING N 46 DEGREES 19 MINUTES 29 SECONDS E 220 FEET TO A POINT;
THENCE TURNING AT AN APPROXIMATE RIGHT ANGLE AND RUNNING NORTHWESTERLY A DISTANCE OF 75 FEET, MORE OR LESS, TO A POINT AT THE NORTHEASTERLY CORNER OF DISTANCE 75 FEET, MORE OR LESS, TO A POINT AT THE NORTHEASTERLY CORNER OF LOT 3 SHOWN ON SAID PLAN, SAID POINT BEING DESIGNATED ON SAID PLAN AS "C.B. TO BE SET,";
THENCE TURNING AND RUNNING BY LOT 3 AND LAND OF "RUTH E. CURTIS" AS SHOWN ON SAID PLAN, S 46 DEGREES 19 MINUTES 29 SECONDS W., 220 FEET TO THE POINT OF BEGINNING.
BEING THE SAME PROPERTY CONVEYED TO PAUL JONES BY DEED FROM EDWARD G. MATTINGLY AND ELAINE R. MATTINGLY RECORDED 06/21/2002 IN DEED BOOK 16766, PAGE 1, IN THE REGISTRY OF DEEDS PLAN FOR NORFOLK COUNTY, MASSACHUSETTS.

Return to:
Orlans PC
P.O. Box 5041
Troy, MI 48007
File Number: 17-011115/231/FORD_DR

Pg 1 of 2

EXHIBIT "A"

ATTACHED TO AND FORMING A PART OF THE FORECLOSURE DEED
FOR PROPERTY AT 572 PARK STREET, STOUGHTON, MA 02072

_____

The premises are to be sold subject to and with the benefit of all easements, restrictions, building and zoning laws, liens, attorney's fees and costs pursuant to M.G.L.Ch.183A, unpaid taxes, tax titles, water bills, municipal liens and assessments, rights of tenants and parties in possession.

TERMS OF SALE:
A deposit of FIVE THOUSAND DOLLARS AND 00 CENTS ($5,000.00) in the form of a certified check, bank treasurer's check or money order will be required to be delivered at or before the time the bid is offered. The successful bidder will be required to execute a Foreclosure Sale Agreement immediately after the close of the bidding. The balance of the purchase price shall be paid within thirty (30) days from the sale date in the form of a certified check, bank treasurer's check or other check satisfactory to Mortgagee's attorney. The Mortgagee reserves the right to bid at the sale, to reject any and all bids, to continue the sale and to amend the terms of the sale by written or oral announcement made before or during the foreclosure sale. If the sale is set aside for any reason, the Purchaser at the sale shall be entitled only to a return of the deposit paid. The purchaser shall have no further recourse against the Mortgagor, the Mortgagee or the Mortgagee's attorney. The description of the premises contained in said mortgage shall control in the event of an error in this publication. **TIME WILL BE OF THE ESSENCE.**

Other terms if any, to be announced at the sale.

The Bank of New York Mellon, f/k/a, the Bank of New York, as Trustee for CWABS, Inc., Asset-Backed Certificates, Series 2004-7

Present Holder of said Mortgage,
By Its Attorneys,
ORLANS PC
PO Box 540540
Waltham, MA 02454
Phone: (781) 790-7800
17-011115

AD#13665856
Stoughton Journal 3/16, 3/23, 3/30/18

Return to:
Orlans PC
P.O. Box 5041
Troy, MI 48007
File Number: 17-011115/231/FORD_DR

69

Pg 2 of 2

**Orlans PC**
**P. O. Box 5041**
**Troy, MI 48007-5041**

FILE: 17-011115

PAUL JONES
572 PARK STREET
STOUGHTON, MA 02072

# ORLANS PC

A law firm licensed in
DC, DE, MA, MD, MI, NH, RI, VA

PO Box 540540
Waltham, MA  02454
P (781) 790-7800   F (781) 790-7801
www.Orlans.com
Business Hours: 8:30 AM – 5:00 PM ET

September 19, 2018

Paul Jones
572 Park Street
Stoughton, MA 02072

| | |
|---|---|
| **Servicer/Lender:** | The Bank of New York Mellon, f/k/a, the Bank of New York, as Trustee for CWABS, Inc., Asset-Backed Certificates, Series 2004-7 c/o Select Portfolio Servicing, Inc. |
| **Borrower:** | Paul Jones |
| **Property Address:** | 572 Park Street, Stoughton, MA 02072 |
| **File Number:** | 17-011115 |

| | |
|---|---|
| **Auction Price:** | $247,500.00 |
| **Total Debt:** | $630,935.82 |

The following sets forth the itemized disposition of the amount paid by the successful bidder at the foreclosure sale on the above referenced property. Below are the Foreclosure Fees and Costs incurred or paid by Orlans PC, which are included in the above Total Debt figure.

**Fees**

- Foreclosure Legal Fees:                                  $2,700.00
- Bankruptcy Legal Fees (if applicable):        $0.00

**Costs**

- Legal Notice Publication Costs:                    $3,430.86
- Postage (Certified Mail):                                $69.50
- Deed Stamps:                                                $1,128.60
- Municipal Lien Certificate:                            $0.00
- Sheriff's Service:                                            $143.62
- Title Abstract/Report:                                    $0.00
- Auctioneer:                                                    $638.66
- Bankruptcy Filing (if applicable):                  $0.00
- Foreclosure Filing:                                        $255.00
- Foreclosure Recording:                                $658.00
- Other: _____          $0.00
- Surplus Funds                                              $0.00

Because the amount of debt exceeded or was equal to the bid amount, there are no surplus funds resulting from the foreclosure sale

17-011115/231/RECOF_DR

**Orlans PC**
**P. O. Box 5041**
**Troy, MI 48007-5041**

FILE:  17-011115

PAUL JONES
79 THOMPSON STREET
SPRINGFIELD, MA 01109

# ORLANS PC

A law firm licensed in
DC, DE, MA, MD, MI, NH, RI, VA

PO Box 540540
Waltham, MA 02454
P (781) 790-7800   F (781) 790-7801
www.Orlans.com
Business Hours: 8:30 AM – 5:00 PM ET

September 19, 2018

Paul Jones
79 Thompson Street
Springfield, MA 01109

| | |
|---|---|
| **Servicer/Lender:** | The Bank of New York Mellon, f/k/a, the Bank of New York, as Trustee for CWABS, Inc., Asset-Backed Certificates, Series 2004-7 c/o Select Portfolio Servicing, Inc. |
| **Borrower:** | Paul Jones |
| **Property Address:** | 572 Park Street, Stoughton, MA 02072 |
| **File Number:** | 17-011115 |

| | |
|---|---|
| **Auction Price:** | $247,500.00 |
| **Total Debt:** | $630,935.82 |

The following sets forth the itemized disposition of the amount paid by the successful bidder at the foreclosure sale on the above referenced property. Below are the Foreclosure Fees and Costs incurred or paid by Orlans PC, which are included in the above Total Debt figure.

**Fees**

- Foreclosure Legal Fees:                    $2,700.00
- Bankruptcy Legal Fees (if applicable):     $0.00

**Costs**

- Legal Notice Publication Costs:            $3,430.86
- Postage (Certified Mail):                  $69.50
- Deed Stamps:                               $1,128.60
- Municipal Lien Certificate:                $0.00
- Sheriff's Service:                         $143.62
- Title Abstract/Report:                     $0.00
- Auctioneer:                                $638.66
- Bankruptcy Filing (if applicable):         $0.00
- Foreclosure Filing:                        $255.00
- Foreclosure Recording:                     $658.00
- Other: _____                 $0.00
- Surplus Funds                              $0.00

Because the amount of debt exceeded or was equal to the bid amount, there are no surplus funds resulting from the foreclosure sale

17-011115/231/RECOF_DR

**Orlans PC**
**P. O. Box 5041**
**Troy, MI 48007-5041**

FILE:  17-011115

PAUL JONES
24 DECKARD STREET , APARTMENT 4
DORCHESTER, MA 02121

# ORLANS PC

A law firm licensed in
DC, DE, MA, MD, MI, NH, RI, VA

PO Box 540540
Waltham, MA  02454
P (781) 790-7800   F (781) 790-7801
www.Orlans.com
Business Hours: 8:30 AM – 5:00 PM ET

September 19, 2018

Paul Jones
24 Deckard Street , Apartment 4
Dorchester, MA 02121

| | |
|---|---|
| **Servicer/Lender:** | The Bank of New York Mellon, f/k/a, the Bank of New York, as Trustee for CWABS, Inc., Asset-Backed Certificates, Series 2004-7 c/o Select Portfolio Servicing, Inc. |
| **Borrower:** | Paul Jones |
| **Property Address:** | 572 Park Street, Stoughton, MA 02072 |
| **File Number:** | 17-011115 |

**Auction Price:**          $247,500.00
**Total Debt:**             $630,935.82

The following sets forth the itemized disposition of the amount paid by the successful bidder at the foreclosure sale on the above referenced property. Below are the Foreclosure Fees and Costs incurred or paid by Orlans PC, which are included in the above Total Debt figure.

**Fees**

- Foreclosure Legal Fees:                    $2,700.00
- Bankruptcy Legal Fees (if applicable):     $0.00

**Costs**

- Legal Notice Publication Costs:            $3,430.86
- Postage (Certified Mail):                  $69.50
- Deed Stamps:                               $1,128.60
- Municipal Lien Certificate:                $0.00
- Sheriff's Service:                         $143.62
- Title Abstract/Report:                     $0.00
- Auctioneer:                                $638.66
- Bankruptcy Filing (if applicable):         $0.00
- Foreclosure Filing:                        $255.00
- Foreclosure Recording:                     $658.00
- Other: _____                 $0.00
- Surplus Funds                              $0.00

Because the amount of debt exceeded or was equal to the bid amount, there are no surplus funds resulting from the foreclosure sale

17-011115/231/RECOF_DR

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**Case No. <u>1:19-cv-11076-FDS</u>**

Paul Jones,

**Plaintiff**

v.

**Dolan Connly P.C., Bank of New York Mellon, Orlans PC, Linda Orlans, Alison Orlans, Select Portfolio Servicing Inc., et. al.,**

**Defendants**

## <u>MOTION TO DISMISS ORLANS PC, LINDA ORLANS AND ALISON ORLANS</u>

NOW COME Orlans PC ("Orlans"), Linda Orlans ("Linda") and Alison Orlans ("Alison"), Defendants in the above-captioned matter, and respectfully requests that this Honorable Court dismiss them from this action, with prejudice, pursuant to Fed.R.Civ.P. 12(b)(6).

In support thereof, Orlans, Linda and Alison state the following:

1. The Plaintiff has failed to state a claim upon which relief can be granted as to them.

2. Orlans, Linda and Alison refer the Court to the supporting Memorandum of Law.

Respectfully submitted,
Orlans PC,
Linda Orlans,
Alison Orlans,
By their Attorney,

/s/ Effie Gikas
Effie L. Gikas, Esq., BBO # 654693
Orlans PC
465 Waverley Oaks Road, Suite 401
Waltham, Massachusetts 02452
(781) 790-7835
egikas@orlans.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**Case No. 1:19-cv-11076-FDS**

**Paul Jones,**

**Plaintiff**

**v.**

**Dolan Connly P.C., Bank of New York Mellon, Orlans PC, Linda Orlans, Alison Orlans, Select Portfolio Servicing Inc., et. al.,**

**Defendants**

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

### Introduction

Orlans PC ("Orlans") is foreclosure counsel for the mortgagee, Defendant The Bank of New York Mellon, f/k/a, the Bank of New York, as Trustee for CWABS, Inc., Asset-Backed Certificates, Series 2004-7, and the loan servicer, Defendant Select Portfolio Servicing, Inc., in regard to the subject property, 572 Park Street, Stoughton, Massachusetts 02072 ("the Property"). Linda is a former employee of Orlans, and Alison is a current employee of Orlans, neither of which should be personally named in this action. Moreover, as foreclosure counsel, Orlans acts on the instructions of its clients, both of which are already named as parties to this action.

### Legal Argument

Plaintiff's Complaint does not state a claim upon which relief can be granted as to Orlans. The United States Supreme Court has issued a decision in a case that specifically discusses the standard for dismissal. In Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955 (2007), the Court seemingly modified the time-honored standard for dismissal set forth in Conley v. Gibson, 355 U.S. 41, 47 (1957), replacing that decision's "no set of facts" language for a "plausibility" standard

with respect to notice pleading in complaints. In other words, according to the Supreme Court in Bell Atlantic, a court should not dismiss a complaint if there are "enough facts to state a claim to relief that is plausible on its face." 127 S. Ct. at 1974, or if the plaintiff has demonstrated a "reasonably founded hope that the [discovery] process will reveal relevant evidence' to support his or her claims" Id. at 1967.

First, the bulk of the claims raised in this action are claims against the mortgagee and/or loan servicer. Orlans cannot be held liable for claims brought against its client. "Generally speaking an attorney is 'immune from liability to third persons arising from the performance of his professional activities as an attorney on behalf of and with the knowledge of his client.'" Sain v. HSBC Mortgage Services, 2009 U.S. Dist. Ct. LEXIS 77336.

Second, the Plaintiff in this action was the mortgagor on the subject loan. Neither Orlans, Linda nor Alison owe him no fiduciary duty. See Balerna v. Gilberti, 281 F.R.D. 63, 65 n.4 (D.Mass. 2012). "Massachusetts law makes it plain as a pikestaff that an attorney does not owe a fiduciary duty to a person who she does not represent." Darlene Manson, et al. v. GMAC Mortgage LLC, et al., 2012 U.S. Dist. LEXIS 59492, at 28 (D. Mass. Apr. 30, 2012), citing Logotheti v. Gordon, 414 Mass. 308, 312 (1993); Robertson v. Gaston Snow & Ely Bartlett, 404 Mass. 515, 522 (1989); Page v. Frazier, 388 Mass. 55, 61-68 (1983). See also MacMillan v. Scheffy, 147 N.H. 362, 365 (2001) ("[W]e decline to impose on an attorney a duty of care to a non-client whose interests are adverse to those of the client."). To find an attorney liable for the actions of his/her client is not only unfair but it impedes effective representation of the client.

Third, in regard to the FDCPA claims raised against Orlans, Linda and Alison, the Supreme Court, in a March 2019 unanimous decision, Obduskey v. McCarthy & Holthus LLP, concluded that conducting a non-judicial foreclosure does not make a law firm a "debt collector" for the

general purposes of the Fair Debt Collection Practices Act (FDCPA), and thus the law firm cannot

be held liable under the statute. Despite Plaintiff's assertions to the contrary in his Complaint, the

Supreme Court found that those enforcing a security interest (i.e. a foreclosure law firm) are

exempt from the "debt collection" definition of the FDCPA. Any correspondence that Orlans

mailed to the Plaintiff was part of the foreclosure process, actions taken as strictly legally necessary

parts of the foreclosure, and such actions are protected by the Court's opinion.

### Conclusion

For all of the reasons set forth above, Plaintiff's Complaint fails to state a claim for which

relief can be granted as to Orlans, Linda and Alison. As such, they must be dismissed from this

action pursuant to Fed.R.Civ.P. 12(b)(6).

Respectfully submitted,
Orlans PC,
Linda Orlans,
Alison Orlans
By their Attorney,


/s/ Effie Gikas
Effie L. Gikas, Esq., BBO # 654693
Orlans PC
465 Waverley Oaks Road, Suite 401
Waltham, Massachusetts 02452
(781) 790-7835
egikas@orlans.com

## **CERTIFICATE OF SERVICE**

I, hereby certify that on this date the foregoing document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those parties which are non-registered participants.

/s/ Effie Gikas
Effie L. Gikas

Dated: December 5, 2019

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| **PAUL JONES,** | ) | |
| | ) | |
| | ) | **Civil Action No.** |
| **Plaintiff,** | ) | **19-11076-FDS** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **DOLAN CONNLY, P.C.; JAMES W. DOLAN;** | ) | |
| **BARBARA D. CONNLY; KATHLEEN M.** | ) | |
| **ALLEN; DAVID A. MARSOCCI; BANK OF** | ) | |
| **NEW YORK MELLON; GREGORY A.** | ) | |
| **CONNLY; ORLANS, P.C.; LINDA ORLANS;** | ) | |
| **ALISON ORLANS; JANE DOE;** | ) | |
| **JOHN DOE; and SELECT PORTFOLIO** | ) | |
| **SERVICING, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS UNDER 12(b)(6) AND FOR FAILURE TO STATE A CLAIM

**SAYLOR, J.**

This action arises out of a mortgage foreclosure.  Plaintiff Paul Jones, proceeding *pro se*, has brought this action against defendants Dolan Connly, P.C.; Orlans, P.C.; Bank of New York Mellon; Select Portfolio Servicing, Inc.; and various attorneys and employees of those firms, alleging unfair and deceptive debt collection practices.  The amended complaint asserts five claims, alleging violations of (1) the Fair Debt Collection Practices Act, 15 U.S.C. § 1692; (2) Mass. Gen. Laws ch. 244, § 15A; (3) Mass. Gen. Laws ch. 93A; (4) Mass. Gen. Laws ch. 244, §§ 35B and 35C; and (5) Massachusetts debt-collection regulations, 940 CMR 7.00.

Defendants have filed three separate motions to dismiss the complaint for failure to state a claim upon which relief can be granted.  Jones has filed an opposition to only one of the three

motions.

For the reasons set out below, the motions will be granted as to Count 1, which is the only federal claim.  The Court will decline to exercise supplemental jurisdiction over the remaining state law claims, and the case will therefore be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c).

## I.     Background

Unless otherwise noted, the following facts are drawn from the amended complaint and accompanying exhibits.

### A.     Parties

Paul Jones is a resident of Stoughton, Massachusetts.  He was the homeowner and mortgagor in the underlying foreclosure and eviction matters.

Dolan Connly, P.C. is a law firm, organized as a professional corporation, located in Boston, Massachusetts.  James Dolan, Barbara Connly, Kathleen Allen, David Marsocci, and Gregory Connly are attorneys at Dolan Connly.

Bank of New York Mellon ("BNY") is a Delaware corporation with a principal place of business in New York.  It was the trustee and foreclosing mortgagee of the mortgage at issue.

Select Portfolio Servicing, Inc. ("SPS") is a Utah corporation with a principal place of business in Utah.  It was the servicer of the mortgage.

Orlans P.C. is a law firm, organized as a professional corporation, located in Troy, Michigan.  Linda Orlans and Alison Orlans are residents of Michigan and attorneys at Orlans P.C.

### B.     Factual Background

In 2004, Paul Jones executed a mortgage on property at 572 Park Street in Stoughton,

2

Massachusetts.  (Amend. Compl. ¶ 62).  In 2005, Jones defaulted on the loan.  (*Id*. ¶ 63).  It appears that he occupied the property and did not make payments on the loan for the next thirteen years.

At some point, the loan was reassigned to BNY.  (*Id*.).  BNY completed a foreclosure sale of the property in 2007, but apparently the foreclosure was subsequently rescinded.  (*Id*. Ex. 6).

In July 2015, Jones received notice that SPS had become the servicer of his mortgage on behalf of BNY.  (*Id*. ¶ 75).  Over the next several years, he received approximately 33 mortgage statements.  (*Id*. ¶ 76).  In December 2017, Jones received a mortgage statement from SPS stating that his account had been accelerated and all outstanding amounts were due at that time.  (*Id*. ¶ 84).  He claims that this acceleration was contrary to his mortgage agreement.  (*Id*.).

Beginning in March 2018, Jones received several notices for a new foreclosure sale.  (*Id*. ¶ 125).  The new foreclosure was handled by attorneys at Orlans, P.C.  (*Id*.).  On April 9, 2018, BNY foreclosed on the property.  (*Id*. ¶ 136).

Eviction proceedings then began against Jones.  (*Id*. ¶ 150).  The auction and eviction process included the mailing of several notices to him, including a notice to quit and a notice of the eviction proceedings.  (*Id*. ¶ 151; Ex. 16 p. 2-7).

Jones filed the complaint in this action on May 9, 2019, and an amended complaint on May 29, 2019.

## II.    **Legal Standard**

 On a motion to dismiss, the court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom."  *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir.

1999)).  To survive a motion to dismiss, the complaint must state a claim that is plausible on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, … on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* at 555 (citations and footnote omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  Dismissal is appropriate if the facts as alleged do not "possess enough heft to sho[w] that [plaintiff is] entitled to relief."  *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (alterations in original) (quoting *Clark v. Boscher*, 514 F.3d 107, 112 (1st Cir. 2008)) (internal quotation marks omitted).  In making that assessment, the court may consider documents attached to the complaint as well as the complaint itself.  *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.,* 524 F.3d 315, 321 (1st Cir. 2008).  Although uncommon, a plaintiff "may plead [herself] out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment."  *Matter of Wade*, 969 F.2d 241, 249 (7th Cir. 1992); *see Barricello v. Wells Fargo Bank, N.A.*, 2016 WL 1244993, at *10 (D. Mass. Mar. 22, 2016) ("When a document attached to a complaint contradicts an allegation in the complaint, the document trumps the allegation.").

A document filed by a *pro se* party "is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice.").  However, while *pro se* complaints are accorded an "extra degree of solicitude", *Rodi v. Ventetuolo*, 941 F.2d 22, 23 (1st Cir. 1991), they still must

4

"set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir. 1998).

## III.   Analysis

The Dolan Connly defendants, BNY and SPS, and the Orlans defendants have separately moved to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  Because the only federal claim is time-barred, and because the Court will decline to exercise supplemental jurisdiction over the remaining claims, it will not address all of the issues raised by defendants.

### A.   Claim under FDCPA

Congress enacted the FDCPA "to eliminate abusive debt collection practices by debt collectors."  15 U.S.C. § 1692(e).  To effectuate that goal, Congress included a provision for civil liability to provide recourse for those harmed by violations of the statute.  15 U.S.C. § 1692k(a).  A litigant can bring such an action "within one year from the date on which the violation occurs."  15 U.S.C. § 1692k(d); *see also Rotkiske v. Klemm*, -- S. Ct. --, 2019 WL 6703563 (Dec. 10, 2019) (holding that the FDCPA statute of limitations, absent application of any equitable doctrine, starts running on date of the violation, not discovery).

Plaintiff filed this suit on May 9, 2019.  Accordingly, any FDCPA claim must be based on violations that occurred no earlier than May 9, 2018.  But even the most generous reading of the complaint forecloses that possibility.  Although the details are less than clear, the complaint and associated exhibits chronicle a long and troubled mortgage relationship tracing back to at least 2005.  (Amend. Compl. ¶¶ 64-69).  For reasons not made clear, the foreclosure in 2007 did not end the matter—the foreclosure was rescinded, the mortgage remained outstanding, and

plaintiff retained occupancy of the property.  In 2015, plaintiff was informed that SPS was now

his mortgage servicer.  SPS sent letters from 2015 until April 2018 advising him as to the

amounts he owed under his mortgage.  (*Id.* ¶ 76).  A new foreclosure took place on April 9,

2018.  (*Id.* ¶ 90).

Again, any claim under the FDCPA arising out of any action occurring prior to May 9,

2018, is time-barred.[1]  Nonetheless, plaintiff contends that numerous "discrete" violations of the

FDCPA have occurred since May 9, 2018.  (Opp. p. 6-7).  However, a detailed reading of the

complaint, his opposition to the motion to dismiss, and nearly 200 pages of exhibits reveals only

two potentially relevant events that occurred during that period:  the eviction proceedings against

him and a single post-foreclosure letter that he received from Orlans.[2]

First, plaintiff argues that the eviction proceedings—which were not commenced until

after the foreclosure occurred—involved FDCPA violations.  "A private plaintiff seeking to hold

a person liable under [the FDCPA] must establish that: (1) the defendant is a 'debt collector;' (2)

who took an action 'in connection with the collection of a[ ] debt;' and (3) the action violated the

substantive proscriptions in those provisions."  *Lipscomb v. The Raddatz Law Firm, P.L.L.C.*,

109 F. Supp. 3d 251, 257-8 (D.D.C. 2015) (citing *Gburek v. Litton Loan Servicing LP*, 614 F.3d

380, 384 (7th Cir. 2010).  The allegations of the complaint fail to satisfy at least the first two of

those elements.

First, the complaint identifies no relevant "debt collector" within the meaning of the

---

[1] According to documents attached to the complaint, plaintiff was actually aware of his potential FDCPA claim before May 9, 2018.  On April 10, 2018, he sent a letter to Orlans P.C. (copying BNY, SPS, the Massachusetts Attorney General's Office, and the CFPB) stating that they had "violated the Fair Debt Collection Practices Act." (*Id.* Ex. 12 p. 2-4).  On April 26, 2018, he sent a similar notice to Dolan Connly P.C., again alleging FDCPA violations.  (*Id.* Ex. 15 p. 2-5).

[2] The amended complaint also points to a letter that highlighted plaintiff's potential rights under the Service Members Civil Relief Act.  (Amend. Compl. ¶ 129).  The complaint alleges that the letter was send on August 31, 2018, but the associated exhibit shows that the letter was actually sent on August 31, 2017.  (*Id.* Ex. 11).

statute.  In *Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029, 1033 (2019), the Supreme

Court held that a law firm hired solely to carry out a non-judicial foreclosure was not acting as a

"debt collector" under the FDCPA.  Here, plaintiff identified only the Dolan Connly defendants

as possible FDCPA violators in the eviction proceeding.  But if foreclosure counsel is not a "debt

collector" under the FDCPA, certainly post-foreclosure eviction counsel is not.  At a minimum,

the act of eviction is even further removed from the collection of a debt than the act of

foreclosure.  Accordingly, there is no valid claim under the FDCPA arising out of the eviction

proceedings, because there was no "debt collector" to which the act applied.

Furthermore, the eviction proceeding was not done in connection with an act of "debt

collection."  "In assessing whether [eviction] filings were submitted in connection with debt

collection, the Court must determine (1) if there were 'debts' and (2) if the eviction complaints

were filed in order to collect on those debts." *Lipscomb v. The Raddatz Law Firm, P.L.L.C.*, 109

F. Supp. 3d  251, 257-8 (D.D.C. 2015) (citing *Hughey v. United States*, 495 U.S. 411, 415

(1990)).  In *Lipscomb*, the court found that the eviction proceedings were initiated in connection

with the collection of a debt because they also "sought a money judgment for amounts allegedly

owed." *Id.*; *see also Romea v. Heiberger & Associates*, 163 F.3d 111, 116 (2d Cir. 1998)

(finding eviction notice to fall under FDCPA because defendant's "aim in sending the letter was

at least in part to induce Romea to pay the back rent she allegedly owed"); *O'Connor v.

Nantucket Bank*, 992 F. Supp. 2d 24, 33 (D. Mass. 2014) (noting that "courts' decisions regarding

the applicability of the FDCPA to eviction actions [are] fact-sensitive" but that the "existing

cases" suggest that "an eviction action can implicate the FDCPA, particularly where the eviction

action includes some demand for payment tied to the property at issue").  That situation is not

present here.  Neither the complaint nor the exhibits contain any evidence suggesting that

plaintiff's eviction involved any demand for payment. That fact is unremarkable, because the eviction occurred *after* the foreclosure: Massachusetts, as with most states permitting non-judicial foreclosure, only allows a post-foreclosure deficiency debt if the mortgagee files a separate action for one. Mass. Gen. Laws ch. 244 § 17. There is no allegation of the filing of a deficiency action here. In short, because the eviction proceeding at issue lacked an associated effort to obtain payment, it was not undertaken in connection with a debt collection.

The post-foreclosure letter from Orlans likewise does not constitute a debt-collection attempt. In *Brown v. Bank of America, Nat., Ass'n*, 67 F. Supp. 3d 508, 518-19 (D. Mass. 2014), a *pro se* plaintiff asserted FDCPA claims against the parties that foreclosed on his property. The court found that the FDCPA claims were time-barred because no debt-collecting activity had occurred within the limitations period. *Id.* In so holding, the court noted that defendant had "sent a mortgage discharge notice [within the limitations period]. But [plaintiff did] not explain how this notice constituted a violation of the FDCPA. To the contrary, [the notice] seem[ed] more like a release of debt than a collection." *Id.*

The post-foreclosure letter here presents a similar circumstance. Jones received a single foreclosure-related letter sent by Orlans on September 19, 2018, setting forth his total debt and the auction sale price of the subject property. (Compl. Ex. 8, p. 4-5).[3] The letter informed him that there were no surplus funds from the foreclosure sale to which he is entitled. (*Id.*). As in *Brown*, that letter cannot reasonably be construed as an effort to collect a debt.[4]

Accordingly, because all of the debt-collecting activities occurred outside of the one-year

---

[3] The letter is also included in Exhibit 11.

[4] The Orlans letter also suffers from the deficiency of not being sent by a "debt collector." Counsel "who engage in only nonjudicial foreclosure proceedings are not debt collectors within the meaning of the [FDCPA]." *Obduskey*, 139 S. Ct. at 1039.

Case 1:19-cv-11076-FDS   Document 56   Filed 12/16/19   Page 9 of 10

limitations period, the FDCPA claim is untimely and will be dismissed against all defendants.

**B.      Supplemental Jurisdiction**

In light of the dismissal of Count 1, the Court will decline to exercise supplemental jurisdiction over the remaining claims.  A district court's original jurisdiction extends, among other things, to claims that arise "under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.  If an action includes both federal-law claims and state-law claims, then the district court may exercise supplemental jurisdiction over the state-law claims.  28 U.S.C. § 1367.  However, where a complaint fails to state a viable claim under federal law and jurisdiction over the remaining claims is based solely on supplemental jurisdiction, a "district court has discretion to decline to exercise supplemental jurisdiction."  *Uphoff Figueroa v. Alejandro*, 597 F.3d 423, 431 n.10 (1st Cir. 2010); 28 U.S.C. § 1367(c).  In so doing, the court "must take into account considerations of judicial economy, convenience, fairness to the litigants, and comity."  *Delgado v. Pawtucket Police Dep't*, 668 F.3d 42, 48 (1st Cir. 2012); *see Wilber v. Curtis*, 872 F.3d 15, 23 (1st Cir. 2017) (noting that "it can be an abuse of discretion—if no federal claim remains—for a district court to retain jurisdiction over a pendent state law claim when that state law claim presents a substantial question of state law that is better addressed by the state courts").

Here, the only federal claim has been dismissed.  All that remains are four state-law claims.  Apart from the complaint and motions to dismiss, no substantial litigation has occurred. Under the circumstances, the Court will to decline to exercise supplemental jurisdiction over the remaining state law-claims.

**IV.     Conclusion**

For the foregoing reasons, defendants' motions to dismiss are GRANTED as to Count 1.

9

The Court declines to exercise supplemental jurisdiction over the remaining claims, which are accordingly DISMISSED without prejudice.

**So Ordered.**

                                        /s/ F. Dennis Saylor IV
                                        F. Dennis Saylor IV
                                        United States District Judge

Dated:  December 16, 2019

## CERTIFICATE OF SERVICE

I, hereby certify that on this date the foregoing document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those parties which are non-registered participants.

*/s/ Effie Gikas*

Effie L. Gikas